PLUNGER ELEVATOR CO. v. STANDARD PLUNGER ELEVATOR CO.

(Circuit Court, D. Massachusetts. May 13, 1907.)

No. 126.

PATENTS—INFRINGEMENT—ELEVATOR MECHANISM.

> The Cole patent, No. 700,740, for a valve mechanism for elevators of the plunger type, designed to secure an automatic slow stop of the elevator in both directions, without affecting the rate of speed in starting cannot be so broadly construed as to cover all means for accomplishing such purpose, but is limited to the means shown, which consists of an auxiliary valve mechanism or what may be fairly considered the equivalent of such mechanism; but, since the invention is not for a mere improvement, in details of construction, but represents a new and advanced step in the art, the patent is entitled to a fairly broad construction upon the question of what may be considered equivalent means. As so construed *held* not infringed by the mechanism shown in the Larsson patents, Nos. 786,653 and 786,654, which does not contain the essential feature of the Cole invention, namely, the throttling of a portion of the pilot valve passage by the movement of the main valve when the elevator is stopped, nor means which are equivalent.

In Equity. On final hearing.

Brown & Durby, for complainant.
Louis W. Southgate and Clifton V. Edwards, for defendant.

COLT, Circuit Judge. This bill charges the defendant with infringement of patent No. 700,740, issued May 27, 1902, to the complainant as assignee of William F. Cole.

The Cole patent relates to hydraulic valve mechanism for regulating the starting and stopping of elevators, particularly hydraulic elevators of the plunger type. The invention is for an improved form of valve, which permits a quick start for the elevator, and at the same time insures a slow stop.

In defining the invention, the specification says:

"My invention relates to regulating mechanism for elevators, whereby the elevator car may be started and reach full speed as quickly as desired; but, however suddenly the operative may attempt to stop the car, the suddenness of stopping is regulated within a predetermined limit, thus permitting a quick start and insuring a slow stop."

"My invention consists, essentially, of means adapted to regulate at independent rates the suddenness of starting and stopping an elevator car."

"More particularly my invention consists of means attached to the valve mechanism, which limits the rate of speed of closing the main valve in either direction without affecting its rate of speed of opening."

"In modern high-speed elevators it is desirable. to have the car reach its maximum rate of speed as soon as possible after starting; but any sudden stopping of the car is undesirable. Among other objections sudden stopping is the cause of an extremely unpleasant sensation which the passengers are made to feel, and in the case of the 'plunger' type of hydraulic elevator if the supply of water to the cylinder be shut off too suddenly the momentum of the rapidly-moving parts which comprise a considerable mass is so great that the plunger will be apt to jump off the water, causing an extremely disagreeable shock to be felt by the passengers."

With respect to the prior art, the specification says:

"Obviously it is not desirable to leave the possibility of sudden stopping in the hands of the operative. This has already been recognized, and a gradual stoppage has been accomplished in several ways by means entirely independent of the controlling device in the car. One method has been to make the ports of the secondary or pilot valve quite small or to throttle them down by means of a screw-plug, which is left permanently adjusted in the required position, allowing only a comparatively small volume of water to flow to or from the motor-cylinder in a given time. A similar result is sometimes accomplished by constructing the ports of the main valve of such shape that as the valve closes the water is gradually shut off. These permanent adjustments which accomplish a gradual stop, both going up and coming down, also of necessity accomplish a gradual start in either direction."

The specification then proceeds:

"To gradually overcome the energy of such a large mass of rapidly-moving matter as is required in an elevator without the undesirable effects above referred to, it is necessary to begin to slow down several feet before the floor at which it is desired to stop is reached. To accomplish this, the movement of the main valve in closing must be very gradual. When the elevator is started, however, it is not necessary nor desirable that full speed should be as gradually reached from full stop as was full stop when the elevator was running at full speed. In fact, full speed can be safely acquired in several feet less travel than within which it would be desirable to stop a car from full speed. Therefore it is not necessary that the main valve should move as gradually in opening or that the same means, if any, should be employed for a gradual start as must of necessity exist in the means for gradual stoppage, which I have referred to above."

The specification further says:

"My invention of throttling device is not limited to the form of throttling-valve shown, as other throttling devices or governors might be applied to accomplish the object, and many changes might be made in the detail of construction and mode of attachment to the reciprocating parts of the valve."

The patent contains 29 claims. Most of these claims are of a broad character. It is sufficient for illustration and for the purposes of this suit to give the first five:

"1. In an elevator, the combination with the car, of motor means for running said car, controlling means adapted to be operated from the car, and an automatic quick-starting, slow-stopping device adapted to permit of a quick start and to regulate the suddenness of stopping whereby the car will be brought to rest gradually.

"2. The combination with the main three-way valve, of means for opening and closing said valve in either direction, and automatic means for regulating the opening and closing movements at different rates of speed.

"3. The combination with the main valve for controlling the passage of fluid under pressure, of means for opening and closing said valve, and automatically-operated quick-opening, slow-closing means connected with said main valve, whereby the speed of opening and the speed of closing the main valve are regulated within independent limits, substantially as described.

"4. In a hydraulic elevator, the combination with a main valve, of a valve-motor, pilot-valve mechanism, and an opening and closing regulating means operated by movement of the main valve, whereby a quick opening and slow closing of the main valve are effected.

"5. The combination with the main valve for controlling the passage of fluid under pressure, of motor means for opening and closing said main valve, secondary valve mechanism for controlling the motor means, and hydraulic opening and closing regulating means for automatically regulating the velocity at which the main valve may be opened and the velocity at which the main valve may be closed at independent rates, substantially as described."

In reading these claims in connection with the specification, it is apparent that the patentee seeks to cover all means for accomplishing an automatic slow stop of the elevator by limiting the rate of speed of closing the main valve and at the same time permitting a quick start; and this is the position taken in the brief of complainant's counsel, as appears from the following extract:

"It appears, therefore, plainly from the specification of the Cole patent that his purpose was to claim broadly any mechanism which limited the rate of speed of closing the main valve automatically without affecting its rate of speed of opening, so that the elevator car might be permitted to reach full speed as quickly as desired, but limited to a gradual or slow speed in stopping, however suddenly the operative might attempt to stop such car.

"This theory thus advanced in the specification is emphasized in the claims of the Cole patent, a careful reading of which will demonstrate the plain intention of the inventor to cover broadly this principle of operation which he had found absolutely necessary in the practical utilization of a plunger elevator. A large majority of the 29 claims are broadly phrased to cover in different forms this idea. * * * There is absolutely nothing in the prior art or the testimony in this case to anticipate this broad, pioneer invention of Mr. Cole. No prior patent can be produced which will show a main valve which can be opened quickly, and yet closed slowly and automatically within a predetermined limit regardless of the way the operator manipulates the pilot valve."

Since infringement is based upon this broad construction of the Cole patent, it becomes necessary to determine the nature and scope of the Cole invention.

The valve of the Cole patent is known in the elevator art as the "pilot valve," and, as appears from the specification and drawings, it was designed for use in plunger elevators. The purpose of the pilot valve is to start and stop the elevator, and to regulate the speed of starting and stopping. The pilot valve is a two-way piston valve.

It has two sides which are duplicates, the supply side and the exhaust side. The supply side has a passage from the supply pipe to the motor cylinder, and the exhaust side has a passage from the exhaust pipe to the motor cylinder. These passages to the motor cylinder are opened or closed by the movements of the pilot valve stem. The elevator is started in its upward or downward movement by opening the supply or the exhaust passage, and it is stopped in its upward or downward passage by closing the supply or the exhaust passage. The speed with which the elevator starts or stops is governed by the quantity of water which is permitted to flow through these passages. If, therefore, these passages are what are termed "enlarged passages," the elevator will start and stop quickly. If they are what are termed "restricted passages," the elevator will start and stop slowly. If one of the passages is an enlarged passage and the other a restricted passage, the elevator will start quickly and stop slowly in one direction, and start slowly and stop quickly in the other direction. It was common in the art to restrict the pilot valve passages by means of throttling devices such as throttling screws, in order to effect a slow start and a slow stop, as distinguished from a quick start and a quick stop. It was also old in the art to accomplish a gradual start and a gradual stop by what are termed "graduated ports" in the pilot valve or in the main valve.

The purpose of the Cole invention was to secure an automatic slow stop of the elevator in both directions without affecting the rate of speed in starting.

Cole accomplished this purpose in the following way: He first constructed his pilot valve with a restricted and enlarged passage for the supply, and a restricted and enlarged passage for the exhaust. He then provided an auxiliary piston valve with a throttling plug on each end of the stem. He then provided means whereby one of the enlarged passages was automatically closed by the throttling plug when the elevator was stopped. These means consisted in connecting the auxiliary pilot valve stem with the main valve stem in such a manner that, when the main valve moved in one direction, the throttling plugs moved in the opposite direction, with the result that on the outward movement of the main valve to start the elevator the throttling plugs closed one of the enlarged passages, so that on the return movement of the main valve to stop the elevator the flow of water was confined to the restricted passage, and hence the main valve moved slowly, thereby causing the elevator to stop slowly. We have, then, in the Cole organization a pilot valve with enlarged and restricted passages, which are open to start the elevator, and with only the restricted passage open to stop the elevator.

The pilot valve mechanism and the nature and scope of the Cole improvement will be better understood by a fuller description of the plunger elevator and its mode of operation. In the plunger elevator a cylinder is sunk in the ground to the same depth as the height to which the elevator is to be raised. A plunger slides in this cylinder, and upon the upper end of the plunger is supported the elevator car. When water is introduced into the cylinder, the water pressure raises the plunger, and consequently the elevator. When water is permitted to flow out of the cylinder, the weight of the plunger and the car

causes the elevator to descend. When no water is permitted to flow into or out of the cylinder, the plunger and the car remain stationary.

The regulation of the flow of water into and out of the cylinder, and the cutting off of the water from the cylinder, are accomplished by a somewhat elaborate system of piston valves. This system comprises the main valve, the motor, the pilot valve, and their connecting mechanisms. The main valve controls the movements of the plunger, which supports the elevator car, the motor valve controls the movements of the main valve, and the pilot valve, which is connected with the operating lever in the elevator car, controls the movements of the motor valve.

The valve mechanism of the plunger elevator is shown in figures 3 and 4 of the Cole patent. These drawings also illustrate the pilot valve mechanism covered by the patent, and its mode of operation.

Fig. 3.

Fig. 4.

The middle part of each of these drawings shows the main valve, the lower part shows the motor, and the upper part shows the pilot valve. The main valve is a three-way piston valve. It has a passage to the source of supply, a passage to the main cylinder, and a passage to the exhaust. It opens the supply to allow the water to flow into the main cylinder to move the elevator upward, it shuts off the supply and the exhaust to stop the elevator, and it opens the exhaust to allow the water to flow out of the main cylinder to permit the elevator to descend. When the elevator is stopped, the main valve occupies its central or neutral position, which is seen in figure 3. In this position the port to the main cylinder is closed, and consequently the water cannot flow into or out of the cylinder.

The main valve is moved from its central position outward to start the elevator, and from its outward position back to center to stop the elevator. When the main valve moves from the center to the right, the main cylinder is connected with the supply, and the elevator ascends, and, when the main valve moves back to center, the supply is cut off, and the elevator stops. When the main valve moves from the center to the left, the main cylinder is connected with the exhaust, and the elevator descends, and, when the main valve moves back to center, the exhaust is cut off, and the elevator stops. If the main valve moves quickly in its outward movements and in its movements back to center, the elevator will start quickly and stop quickly. If the main valve moves slowly in its outward movements and in its movements back to center, the elevator will start slowly and stop slowly. On the other hand, if the main valve moves quickly in its outward movements and slowly in its return movements back to center, the elevator will start quickly and stop slowly.

The motor consists of a cylinder with two pistons. As the drawings show, the motor stem and the main valve stem are so connected that the movements of the motor pistons and of the main valve pistons must be the same. The movements of the motor pistons are controlled by the pilot valve. When the supply and exhaust of the pilot valve are cut off from the motor, the motor pistons are at their central or neutral position, as shown in figure 3. When the supply of the pilot valve is open, the motor pistons move from their central position to the right, as shown in figure 4, and the elevator ascends. When the supply of the pilot valve is cut off and the exhaust is open, the motor pistons move back to center, and the elevator stops. On the other hand, when the exhaust of the pilot valve is open, the motor pistons move from their central position to the left, and the elevator descends. When the exhaust of the pilot valve is cut off and the supply is open, the motor pistons move back to center, and the elevator stops. If the pilot valve has enlarged supply and exhaust passages, the outward movements and the return movements of the motor pistons, and therefore of the main valve, will be quick, and the elevator will start and stop quickly. If the pilot valve has contracted supply and exhaust passages, the outward movements and the return movements of the motor pistons, and therefore of the main valve, will be slow, and the elevator will start and stop slowly. On the other hand, if the pilot valve has a contracted passage and an enlarged pass-

age for the supply, and a contracted passage and an enlarged passage for the exhaust, and both these passages are open on the outward movements of the motor pistons, and only the contracted passage is open on the return movements of the motor pistons, the elevator will start quickly and stop slowly.

The pilot valve, as the drawings show, has two sides which are alike—the supply side, which connects with the supply pipe, and the exhaust side, which connects with the exhaust pipe. When the pilot valve is in its central or neutral position, as shown in figures 3 and 4, both the supply and the exhaust are cut off from the motor. The movement of the pilot valve to the left opens the supply to the motor cylinder, and the movement of the pilot valve to the right opens the exhaust to the motor cylinder. The pilot valve is so connected with the main valve that the movement of the main valve in either direction or back to center moves the pilot valve back to its central position. In other words, the pilot valve is automatically returned to its central position by the movement of the main valve. When the operator presses the lever down, as shown in figure 4, the pilot valve moves to the left and opens the supply, which causes the motor pistons to move to the right, and therefore the main valve, and the elevator starts in its upward movement. This outward movement of the main valve returns the pilot valve to its central position, without affecting the position of the operating lever. When the operator moves the lever back to center, the pilot valve moves to the right, and opens the pilot exhaust, which causes the motor pistons to move back to center, and therefore the main valve, and the elevator stops in its upward movement; and the reverse operation takes place in starting and stopping the elevator in its downward movement.

If we look at the upper part of each of the two drawings, we see that the pilot valve has a contracted passage and an enlarged passage for the supply, and a contracted passage and an enlarged passage for the exhaust. We also see an auxiliary piston valve, with a throttling plug on each end of its stem. We also find that the stem of this piston is so connected with the main valve stem that, when the main valve moves to the right, the throttling plugs move to the left, and vice versa. The effect of this is, as seen in figure 4, that, when the supply or exhaust of the pilot valve is open and the main valve moves to the right or to the left, the throttling plug closes the enlarged passage of the supply or the exhaust, so that the supply and exhaust passages to the motor cylinder are restricted on the return movements of the motor pistons. The result is that the return movements of the motor pistons and main valve are slow, while the outward movements are quick, and consequently the elevator starts quickly and stops slowly.

We are now prepared to determine the nature and scope of the Cole invention. At the time of his invention the plunger elevator art had already reached the practical or commercial stage. It had, in fact, reached the stage of an advanced art. The Cole invention, therefore, does not mark the line between practical success and practical failure in plunger elevators, and hence his patent cannot be said to cover a broad pioneer invention. His patent is for a pilot valve

153 F.—48

which secures an automatic slow stop, while permitting at the same time a quick start. This at most is an improvement over prior pilot valves, which automatically insured a slow start and slow stop, or a quick start and quick stop, or which prevented a sudden start and sudden stop.

Cole started to make his pilot valve with the idea that in modern elevators of the plunger type it was very desirable to have an automatic quick starting and slow stopping elevator. His invention does not reside in the idea of quick starting and slow stopping, but in the means he devised for accomplishing this result. The patent correctly defines the invention when it declares:

"More particularly my invention consists of means attached to the valve mechanism which limits the rate of speed of closing the main valve in either direction without affecting the rate of speed of opening."

It is these means which constitute the real invention covered by the patent. This being true, the scope of the invention cannot be extended by the broad language which may be found in the specification, nor by the broad terms of the claims. A patentee cannot cover all means for accomplishing a certain result by a statement in the specification that his invention is not limited to the particular form of device described, nor by so framing the claims as to include all means for accomplishing the result. To hold that the Cole patent embraces all means for effecting a quick start and slow stop would be to hold that the patent covers a function or result. The monopoly to which Cole is entitled under his patent lies in the means by which he solved the problem of a quick start and a slow stop, namely, the auxiliary valve mechanism described in his patent, or what may be fairly considered the equivalent of that mechanism. The range of what will be regarded as equivalents depends upon the character of the invention, and, since the Cole patent is not for a mere improvement in details of construction, but represents a new and advanced step in the art, the court should apply the doctrine of equivalents as it is commonly applied in dealing with this class of patents by giving a fairly broad construction as to what will be considered equivalent means for accomplishing the same result.

The means attached to the valve mechanism by which Cole solved the problem of a quick start and slow stop are the enlarged passages of the pilot valve, the supplementary piston, the throttling plugs, and the connecting devices by which the throttling plugs are made to close the enlarged passages by the movements of the main valve. The essence of these means may be said to reside in so connecting the throttling plugs with the main valve that a part of the pilot valve passages will be closed by the movement of the main valve. On the question of infringement, the form of the pilot valve passages is not material, nor the form of the supplementary piston with the throttling plugs on each end, nor the form of connecting devices by which the main valve moves the throttling plugs to close in part the pilot valve passages; but what is material, since it is the very essence of the invention, is the closing of a portion of the pilot valve passages by the movement of the main valve. A pilot valve in which this

feature is not found does not contain the Cole invention, and is therefore not within the Cole patent.

The defendant's elevator is constructed under the Larsson patents, Nos. 786,653 and 786,654. The following cut from the latter patent shows the valve mechanism and connections:

The upper part of this figure shows the main valve, the motor, and the pilot valve arranged in a somewhat different way from the Cole apparatus, the motor being in line with the main valve, and the pilot valve set at right angles thereto. The main purpose of the Larsson pilot valve is to prevent the sudden reversal of the elevator. To accomplish this, the mechanism is so organized that, when the operating lever is moved from its central position in either direction to start the elevator, the operator cannot move the lever back beyond its central position until the main valve has returned to its central position, which takes place when the lever is moved back to center to stop the elevator.

As is seen from the drawing, the pilot valve consists of a two-way piston valve, with a throttling plug on each end of the piston rod. The pilot valve has graduated supply and exhaust ports, consisting of six circular openings and three diagonal openings on each side; the latter openings being throttled with screw plugs. The main valve also has graduated ports.

Connected with the pilot valve is a supplementary mechanism, comprising an auxiliary pilot valve stem, rack, elongated pinion, screw, nut, and rotating and stationary cams. The auxiliary pilot valve stem is connected at its lower end with the pilot valve stem, so that both stems move together. The rack is attached to the main valve stem. The elongated pinion, the screw, and the two rotating cams are attached to the auxiliary pilot valve stem, while the two stationary cams are attached to the frame.

The auxiliary pilot valve stem, rack, pinion, screw, and nut are the means provided for automatically returning the pilot valve to center on the movement of the main valve. The rotating and stationary cams, which are normally separated a certain distance, perform a double function. They limit the outward throw in either direction of the operating lever from its central position to start the elevator. They also prevent the throw of the operating lever back beyond its central position after it has been thrown in either direction to start the elevator until it has been returned to its central position and the elevator stops.

When the operating lever is in its central position, as shown in the drawing, the pilot valve and the main valve are in their central positions, and the cams are in their central position. When the lever is moved in either direction to start the elevator, the pilot valve stem is moved up or down, thereby opening the supply or exhaust, which causes the main valve to move to the right or to the left. This movement of the main valve sets in operation the rack and pinion and screw, thereby bringing the pilot valve stem back to center, but leaving the lever in its outward position. On the return throw of the lever to center to stop the elevator, the pilot valve stem opens the supply or exhaust, which causes the main valve to return to center; and this movement of the main valve sets in operation the rack, pinion, and screw, thereby bringing the pilot valve stem back to center with the lever in its central position ready to start the elevator again in another up or down movement.

When the lever is in its central position its throw in either direction is limited by the distance between the cams. When the lever is thrown outward in either direction to start the elevator, and the pinion begins to rotate on the movement of the main valve, the rotating cams will occupy such a position with respect to the stationary cams as to prevent the throw of the lever back beyond its central position, and therefore prevent the operator from suddenly reversing the movement of the elevator. And this is true whether the pilot valve is partly or wholly opened, for in no instance, by reason of the position of the cams, can the operator after starting the elevator move the lever beyond its central position until the main valve moves back to center and the elevator stops.

This operation is described in Larsson patent No. 786,654 as follows:

"As shown in the drawings the parts are in normal position and the operator can move the pilot valve either up or down from the central position any distance up to its extreme of travel, which is the pitch of said screw, 37, or the distance said screw, 37, will move when making one revolution in nut, 36. Suppose the operator should move the lever, 16, half-way down to the position shown at 46. This will move the pilot valve half-way down and will cause the main valve to move half-way to the left. This movement of the main valve will turn the pinion, 40, a half-turn, which will restore the pilot valve to normal position, the lever, 16, remaining at position 46. This will bring the cams 44 and 45 to the vertical position, shown in the drawings; but as they have turned half-way around the distance that the cam 44 can now be moved into cam 42, or the distance the cam 45 can be moved into the cam 43 will only be one-half of a pitch. The operator can now at any time move the lever, 16, still lower to increase the speed of the car; but from position 46 the operator

can only move the lever, 16, upward to the central position, and cannot pass the central position until the high point of the cam 45 is turned back to clear the high point of the cam 43, which only takes place when the main valve reaches its closed position in its travel to the right. Thus the operator cannot move the operating lever, 16, up past the central position until the main valve reaches its closed or central position. If the operating-lever, 16, should be moved half-way up or to position 47, substantially the same action would take place, except that the cams 44 and 45 would be revolved a half-turn in the opposite direction when the main valve reaches its half-way position to the right to allow the cylinder, B, to exhaust, whereby the operating-lever, 16, can only be moved back to the central position until the high point of the cam 44 is turned back past the high point of the cam 42. The same action takes place no matter what degree the operating-lever is moved up or down, as the partial revolution of the cams, 44 and 45, is proportional to the movement of the operating-lever, 16—that is to say, if the lever, 16, is moved down to any extent up to a full movement thereof it is locked from being moved back past its central position by cams 45 and 43 until the main valve comes back to its central position, or if said lever, 16, is moved upward to any extent up to a full movement thereof it is locked from being moved back past its central position by cams 44 and 42 until the main valve comes back to its central position. This prevents a careless operator from reversing the motion of the car violently or instantaneously, as the main valve must come back easily to its central position by reason of the graduated openings in the pilot valve, it being impossible to throw the pilot valve across the center to alter the gradual centering of the main valve. Each centering movement of the main valve takes place at exactly the same rate of speed as the main valve comes to rest as it moves away from its central position to cause the car to go up and down."

The main ground upon which the complainant bases infringement is that in the defendant's elevator as actually constructed the return throw of the pilot valve stem is less than the outward throw, with the result that, while the outward throw opens all the supply or exhaust ports, the return throw only opens a portion of the supply or exhaust ports, and hence the main valve moves quickly in its outward movements and slowly in its return movements, thereby causing the elevator to start quickly and stop slowly.

Whether the return throw of the pilot valve stem is the same as the outward throw depends upon the construction of the screw and cams. If the pitch of the screw and cams is the same, as contended by the defendant, the return throw will be the same as the outward throw, because upon the outward throw the movement of the main valve will cause a complete revolution of the pinion, thereby bringing the cams back to the same position, so that the return throw will necessarily be the same. If, on the other hand, the pitch of the screw is different from the pitch of the cams, the return throw may be less than the outward throw, because on the outward throw the movement of the main valve will not cause the pinion to make a complete revolution, so that the cams will not be returned to the same position, but to a new position in which their contact will prevent the full return throw.

In support of its contention that in defendant's pilot valve the return throw of the pilot valve stem is less than the outward throw, the complainant called two witnesses, Ernest W. Marshall, an engineer of the Otis Elevator Company, and William F. Cole, the inventor of the patent in suit. Mr. Marshall examined one of the defendant's elevators which was being installed in the Wabash Terminal at Pittsburg. As a result of this examination and of sketches

taken at the time, Marshall made a drawing which is in evidence. From this drawing and from other knowledge of a somewhat general character, Mr. Cole constructed a model of defendant's structure which is also in evidence. In this model the return throw of the pilot valve stem is less than the outward throw. Mr. Cole afterwards examined the Wabash Terminal elevator, and made an amended drawing of a section of defendant's pilot valve, which is also in evidence. It is admitted that Marshall's first drawing was not free from mistakes. It is also true that it does not appear from the testimony of Mr. Marshall or Mr. Cole that either of them made any measurements of the pitch of the screw and cams or of the throw of the pilot valve stem in the Wabash Terminal elevator. It further appears that the testimony of complainant's expert McElroy, in complainant's prima facie case, is based upon the correctness of these drawings and of the Cole model.

On the other hand, the defendant has met this issue by the following evidence: The Larsson patents, which describe the pitch of the screw and the cams as the same; copies of the working drawings, or blueprints from these drawings, of defendant's elevators, including those installed at Pittsburg, which show that the pitch of the screw and cams is the same; the testimony of Mr. Larsson, the patentee, who is the chief engineer of the defendant, and of Mr. Waterman, the superintendent, who both swear that the defendant's elevators were constructed from these drawings; and, further, that the defendant never built an elevator in which the pitch of the screw was not the same as the pitch of the cams. Upon this state of proof the complainant clearly has failed to establish that the defendant has ever built an elevator in which the return throw of the pilot valve stem was less than its outward throw.

If, however, the evidence had been otherwise, and it had been shown that in defendant's pilot valve the pitch of the screw and the cams was such as to make the return throw of the pilot valve stem less than the outward throw, the complainant, in my opinion, would still have failed to make out a case of infringement, because the result is not accomplished by the same or equivalent means. The means are not the same, since this form of defendant's pilot valve does not contain the essential feature of the Cole invention, namely, the throttling of a portion of the pilot valve passages by the movement of the main valve. Nor are the means equivalent, since it cannot be said, upon any proper construction of the Cole patent, that to effect a restriction of the pilot valve passages in stopping the elevator by limiting the return throw of the pilot valve stem is the equivalent of the independent throttling mechansim of the Cole patent, which automatically closes a portion of the pilot valve passages by the movement of the main valve.

In complainant's rebuttal evidence Mr. McElroy advanced other theories of infringement. All these theories rest upon the untenable assumption that the Cole patent covers all means for permitting a quick start of the elevator, and at the same time insuring an automatic slow stop. Suppose, for example, as contended by Mr. McElroy, the defendant's structure is so organized that the main valve has an idle-

travel or an unnecessary post area, with the result that the elevator starts quickly and stops slowly, it is obvious that any such solution of this problem is outside of the Cole conception, or of the means in which he embodied his conception as set forth in his patent. And the same reasoning applies to Mr. McElroy's other theories.

From a full and careful consideration of defendant's structure, I have reached the conclusion that there is no difference between the opening and closing movements of the main valve; and, therefore, if the elevator starts quickly, it must necessarily stop quickly, and, if it starts slowly, it must necessarily stop slowly, during both its ascent and descent. This conclusion is based upon the fundamental fact that the supply side and the exhaust side of the pilot valve are the same in construction and mode of operation.

A decree may be entered dismissing the bill.