CARDOX CORP. v. ARMSTRONG COAL-
BREAK CO.

No. 10438.

United States Court of Appeals
Seventh Circuit.

Jan. 15, 1952.

Rehearing Denied Feb. 19, 1952.

Bernard A. Schroeder, Bradford Wiles, Chicago, Ill., Eugene C. Knoblock, South Bend, Ind. (Schroeder, Merriam, Hofgren & Brady, Chicago, Ill., Oltsch & Knoblock, South Bend, Ind., of counsel), for defendant-appellant.

George I. Haight, Andrew J. Dallstream, Fredric H. Stafford, Robert R. Lockwood and John W. Hofeldt, Chicago, Ill., for plaintiff-appellee.

Before DUFFY, FINNEGAN and SWAIM, Circuit Judges.

DUFFY, Circuit Judge.

Plaintiff charges defendant with infringement of Claims 2, 3 and 6 of Armstrong patent No. 2,212,891 applied for May 29, 1933, and issued August 27, 1940, and of Claim 1 of Harris patent No. 2,083,705 applied for June 14, 1933, and issued June 15, 1937. Defendant urges invalidity for lack of invention over the prior art, noninfringement, and misuse by plaintiff of the patents in suit, precluding it from any right to equitable relief. The district court held that the claims of the patents in suit were valid and infringed by defendant's device, and overruled the defense of misuse of the patents.

The patents in suit have to do with improvements in compressed air cartridges. Although not limited to coal mining, plaintiff's commercial airdox device and defendant's accused device are used in coal mines for breaking down coal. In an under-surface coal mine the procedure is to make a deep horizontal cut at or near the level of the mine floor. Holes are then driven horizontally into the coal face above the cut. Formerly it was the usual method to place black powder or other explosives in the holes and ignite same. The resulting blast broke down the coal. The size of the lumps of coal produced by an explosion depends somewhat upon the intensity of the blast: a light charge will produce large lumps and a heavy charge will produce more finely broken coal.

Coal mining is dangerous because numerous coal dust and gas explosions have been accidentally ignited by a spark or a flame, often causing great loss of life and property damage. Mining laws in Illinois and some other States prohibit the shooting or breaking down of coal with explosives during regular working shifts. The air cartridge was developed to avoid the necessity of using explosives or electric or other ignition devices. Highly compressed air of the order of 10,000 lbs. per square inch is used in these cartridges and the quick release of such air is effective to provide a

blasting effect which will knock down the coal.

In 1933 Frank Armstrong designed a precharged air cartridge, which could be fired at will from a remote position by means of a special air gun chisel positioned at the rear of the cartridge to perforate a disc. The air gun was to be held adjacent to the disc by means of an expansible rubber sleeve. He applied for a patent on May 29, 1933, which he assigned to plaintiff, and over seven years later it became the Armstrong patent in suit.

The patents in suit are concerned with cartridge valves that can be used repeatedly. Each employs a "differential valve" wherein a rod is provided at one end with a valve head to close the discharge opening at the front end of the cartridge, and at the opposite end a piston which separates a control chamber from the main chamber of the cartridge. The piston permits slow passage of air from the control chamber to the main chamber, but prevents passage of air in the opposite direction. In each patent a frangible disc must be broken to drop the air pressure in the control chamber below that of the main chamber. This causes the valve head to open and permits the air to rush out. The disc at the rear of the control chamber must be replaced after each shot.

Plaintiff brought out its commercial airdox cartridge in 1935. It has a discharge opening at the center of its front end which is controlled by a differential valve mechanism. The main chamber is separated from the rest of the cartridge by a fixed baffle plate through which the differential valve rod extends to a piston in the rear of the baffle. The piston divides the rear portion of the cartridge into a control chamber and an intermediate chamber. When the pressure in the control chamber drops substantially below that of the main chamber, the differential valve moves in the direction of the rear of the cartridge pulling the valve head back, and permitting the air to shoot forwardly through the discharge port.

The claims of the patents in suit are:

Armstrong No. 2,212,891:

Claim 2: "A material breaking device comprising a cartridge having a chamber adapted to receive a charge of highly compressed air or other gas and a discharge opening through which said charge may escape, and a differential valve within said chamber for controlling said discharge opening."

Claim 3: "A material breaking device as defined in claim 2 further characterized in that the said differential valve is controllable from a remote point."

Claim 6: "A cartridge having a chamber adapted to receive a charge of gas at working pressure, and a repeatedly reusable valve reciprocable bodily between positions within said chamber in which it respectively seals the charge in said chamber and permits discharge of said charge therefrom, and means constructed and arranged and subject to remote control for moving said valve from its sealing position to its discharging position to release said charge."

Harris No. 2,083,705:

Claim 1: "A material breaking apparatus comprising a cartridge adapted to receive a charge of high pressure air or gas and embodying a discharge orifice through which such charge may be released, a differential valve mechanism normally sealing said orifice when pressure exists within the cartridge and means for effecting the opening of said differential valve mechanism automatically upon the attainment of a predetermined pressure within the cartridge."

It is thus apparent that the patents in suit relate to mechanisms to hold and control the high pressures of compressed air, and to cause the quick discharge thereof, so as to break down coal or other material. Apparently Armstrong believed his invention to be the placing of a reusable differential valve in a compressed air cartridge and activating said valve by shooting out the breakable disc with his special air gun. The Harris patent uses a structure disclosed by Armstrong, specifically mentioning a differential valve, but contemplating shooting the cartridge when a predetermined pressure is reached and while it is still connected with the air supply line.

The inventor, Harris, was plaintiff's patent attorney and was later president of plaintiff. Harris had prepared and filed the

Armstrong application about 15 days before filing on June 14, 1933, the application in his own name resulting in the Harris patent in suit. He also filed on May 27, 1933, the application resulting in the Dull patent No. 2,083,695, owned by plaintiff. There is some evidence in the record to support the findings of the district court that Armstrong in 1933 was a few months ahead of Dull.

Claiming invalidity because of lack of invention over the prior art, defendant relies heavily on Pratt patent No. 387,256. Pratt disclosed a pneumatic cartridge as a propellant for ammunition. The cartridge of Pratt is shown in a gun barrel. It is operated by a hammer striking a pin to turn the control valve to venting position. While claim 2 of the Armstrong patent in suit does read upon the Pratt disclosure in several respects, it is clear that even if Pratt were operative, it was not intended for a material breaking device, except in so far as any artillery shell might damage any object with which it came into contact. No attempt was ever made to mine coal with the device. The trial court found as a fact that the device disclosed in the Pratt patent is inoperative as a coal-blasting device. That it was in fact inoperative is shown by many deficiencies appearing on the face of the patent.

The trial court found that the Pratt patent which was issued August 7, 1888, is directed to the ordnance art and is non-analogous to the mining art using compressed air. In A. J. Deer Co., Inc., v. United States Slicing Mach. Co., 7 Cir., 21 F.2d 812, this court pointed out that reference to a non-analogous art was useless as an anticipation. On page 813, of 21 F.2d, we said: "We are of opinion that whether arts or uses are analogous depends upon the similarity of their elements and purposes. If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then we are of opinion that such arts must be said to be analogous, and, if the converse is true, they are non-analogous arts."

In that case the patent in suit covered a device for holding meat in a slicing machine, and the reference relied upon in defense disclosed an arrangement of sawmill dogs for holding logs in place for sawing.

The Patent Office did not cite the Pratt patent nor did the defendant do so in its original answer. Giving effect to the presumptive validity of the patents in suit, we cannot say that the trial court was in error in holding that the defendant did not sustain the burden of proof upon it to show the invalidity of such patents. We reach this conclusion after having considered, among others, the following prior art patents cited by defendant: Helmholtz and Ferrell No. 1,569,226; Helmholtz and Ferrell No. 1,723,351; Crawford, Helmholtz and Ferrell No. 1,632,887; Hart No. 1,705,248; and Hodge No. 339,983, a British patent.

Whether defendant's accused device infringes the claims of the patents in suit depends largely on whether defendant's device includes a differential valve. Claim 1 of the Harris patent in suit specifies "a differential valve mechanism." Claims 2 and 3 of the Armstrong patent in suit specify "a differential valve." The necessary structure for a differential valve is described in the patent in suit, and also in the Dull patent owned by plaintiff. In the Harris patent the differential valve is described as follows: "In order to effect the discharge of a cartridge of this type it is merely necessary to effect a rapid decrease in pressure within the chamber 5, thus resulting in a reverse differential pressure condition wherein the pressure exerted on the plunger from chamber 4 exceeds that exerted thereon from chamber 5, with a consequent axial movement of the entire differential valve mechanism."

In the Armstrong patent the operation of the differential valve is described as follows: "In order to actuate the valve at the discharge end of the cartridge * * * it is merely necessary to vent chamber 8 to the atmosphere as suggested above by merely puncturing the small metal disc 10. The puncturing of this disc 10 results in the immediate reduction in pressure within chamber 8 thus giving rise to an unbalanced

pressure relation as regards the pressures acting on opposite faces of the collar 7. It is apparent that the instantaneous reduction of pressure within chamber 8 results in a preponderance of pressure acting on the opposite face of collar 7 from the high pressure air contained in the main chamber 9 of the cartridge. This unbalanced pressure relation results in an immediate axial movement of the collar 7 * * *. The axial movement of collar 7 * * * continues in the same direction under the preponderance of pressure in chamber 9 thus causing rapid axial movement of the rod and, of course, also of the valve carried on the end thereof."

■ True, the trial court found that defendant's device contained a differential valve, but gave no definition or description of what a differential valve is. Merely giving a structure a name is not sufficient to qualify it as such. What a technical term, such as "differential valve," actually means should if possible be found in the patent itself. Advance Rumley Co. v. John Lauson Mfg. Co., 7 Cir., 275 F. 249; Universal Oil Products Co. v. Globe Oil & Refining Co., 7 Cir., 137 F.2d 3; Permo, Inc., v. Hudson-Ross, Inc., 7 Cir., 179 F.2d 386. Plaintiff's expert witness argued that when a single pressure acts upon an irregular surface the net or resulting force (obtained by cancelling out the uniform opposing forces) is a "differential force," and that when that newly designated force acts upon a valve such valve is "the differential valve" specified in the claims in suit.

We do not agree. Considering the language of the patents in suit, we think a differential valve must have a movable member separating two pressure chambers and be connected to the valve head so that whichever pressure is made to predominate will urge the valve head to move correspondingly. The accused structure completely lacks the two essential pressure chambers separated by a piston that characterizes a differential valve as described in the patents in suit.

■ Although apparently no type of valve other than a differential valve could work by rupturing a disc in the rear of the control chamber to produce a differential pressure, plaintiff relies upon a "catch-all" clause in the Armstrong patent. However, such clause is no basis for an argument that defendant's uniform pressure sleeve valve which operates in a single chamber at but one pressure could be an equivalent of a differential valve which must separate two chambers and is operable only by producing a difference in pressure in the two chambers. Applicable here is a statement of the court in Plunger Elevator Co. v. Standard Plunger Elevator Co., 1 Cir., 153 F. 747, 754: " * * * A patentee cannot cover all means for accomplishing a certain result by a statement in the specification that his invention is not limited to the particular form of device described, * * *."

In the accused structure the lateral discharge ports are closed by a hollow sleeve valve which is held in position by a perforate spider secured to the shear plunger. This plunger extends through the front end of the cartridge and makes contact with a nail outside the casing. The sleeve member is sealed against leakage on opposite sides of the discharge ports by a pair of "O" rings. To prevent the O rings from being dislodged or damaged, a sleeve-like follower is provided. The follower has an annular shoulder portion slidable in a slight enlargement of the main cylinder, and the front of the enlargement is vented to atmosphere. Defendant's cartridge has no control chamber and it has no piston to control the passage of air into the main chamber or to close the valve as required by the patents in suit. Air pressure throughout the accused cartridge is uniform at all times. The valve is held closed by the shear pin which is not aided by the pressure of the air in the cylinder.

It is our opinion that there is no identity of invention between the accused device and the devices of the patents in suit. Unlike the patented structures, the air pressure within the accused cartridge does not move the valve to closed position or hold it closed. It does the opposite, for the pressure urges the valve to open position. As heretofore indicated, the patented structures cannot operate without having a piston separating the control chamber from the main chamber, and must have a check valve arrange-

ment to prevent air from moving back into the control chamber. The accused structure has no control chamber, piston or check valve. In the patents in suit the compressed air forces the solid valve head into tight sealing engagement with its seat. In the accused device the hollow sleeve valve has only circumferential contact with the cylinder and the sealing O rings, and the air pressure urges the valve into open instead of closed position. In the Armstrong patent the operator, at a remote point, may at will puncture the disc by an air gun chisel and thereby lower the pressure in the control chamber and thus actuate the differential valve. In the Harris patent the cartridge is discharged by producing a "reverse differential pressure condition" in the cartridge by venting the control chamber. In the accused device it is only the strength of the shear pin which determines at what pressure the cartridge will shoot. An air cartridge utilizing a differential valve which has been given even a partial charge of air cannot be de-activated except by shooting. If a valve sticks and the cartridge fails to shoot, the cartridge must be removed from the hole in the coal face, and it is as dangerous to handle as a live bomb. In the accused device, however, as there is only a single chamber, the cartridge can be de-activated at any time by bleeding out all the air through the supply line. No gauges are necessary with the accused device as the nail determines when there is sufficient pressure inside to shoot the cartridge. The operator merely turns on the supply valve and leaves it open until the cartridge shoots. Unlike when a differential valve is used, no air is wasted to actuate the valve.

In the summer of 1933 Armstrong ran a series of tests with cartridges constructed like the devices of the patents in suit. He encountered repeating or stuttering shots. If the control chamber back of the piston of the differential valve was not vented quickly enough, the main discharge opening would open and close as further venting occurred. At times there were as many as five quick shots from one charge of the cartridge. This action was considered undesirable and unsafe. However, in the accused device which has no differential valve,

the uniform air pressure can never act to close the valve sleeve. In passing it may be noted that in plaintiff's commercial device the repeating of shots was largely overcome by installing a baffle plate which formed a third chamber in the cartridge.

There is no remote control in the accused device within the meaning of the Armstrong patent in suit as limited by its interference file wrapper. During the prosecution in the Patent Office of the Armstrong patent in suit, it became involved in an interference with the application of Ferrell and Helmholtz which resulted in patent No. 2,253,115. Plaintiff's attorneys defined what the term "remote control" is not intended to cover in the Armstrong patent in suit saying, "A collapsible bar adapted to give way at a predetermined pressure does not in any sense respond to the limitations of the count. The count necessarily requires the existence of some releasable means under the control of the operator at a point remote from the cartridge, and this releasable means cannot constitute merely a rupturable disc or element in the cartridge assembly which is solely responsive to the charging pressure."

Plaintiff is therefore estopped to assert that Claims 3 and 6 which specify remote control are infringed by the accused device which has no releasable means under the control of the operator and can only shoot when the nail or shear pin on the cartridge ruptures at a predetermined pressure.

In defendant's device, the slide valve is controlled by the nail, which is not in a remote position, but is in close relation to the outside of the cartridge.

It is our opinion that none of the four claims in suit read on the accused device. Neither the differential valve described in Claims 2 and 3 of Armstrong and Claim 1 of Harris, nor the remote control described in Claims 3 and 6 of Armstrong, nor an equivalent of either, are present in the accused structure, and plaintiff's charge of infringement must fall.

Although plaintiff claims that defendant copied the devices of its patents, the copying was done by plaintiff in its commercial cartridge. Plaintiff first leased airdox tubes to mine owners in 1935. Defendant

entered the field in 1948. In 1951 plaintiff for the first time offered a cartridge which operates like that of the defendant, except that a strip of shim material instead of a nail is sheared off to control the pressure at which the cartridge will shoot.

There remains for consideration the claim of defendant that plaintiff has misused its patent monopoly. If defendant's contention in this respect is sustained, it constitutes an additional reason why relief should be denied plaintiff in this action.

Plaintiff does not sell or lease its patented airdox cartridges separately, but only leases them in combination with other elements and equipment, the aggregation of which is called the Airdox Unit. Each such unit includes 5 of the airdox cartridges patented by plaintiff, and a motor, a compressor, 4 blow-down valves, 3 line valves, 3 unions, 3,000 feet of steel tubing, 500 feet of copper tubing, and all necessary connectors, all of which, as far as this record discloses, are unpatented. Plaintiff purchases steel fittings, tubing, electric motors and switches, and valves from other companies. However, it manufactures the compressors, claiming that compressors on the market are not suitable to function in the Airdox Unit.

The lease obligates the lessee to pay 6¢ a ton on coal broken by the Airdox Unit, with a minimum rent based on 75,000 tons of coal per year per unit. Lessee is required to maintain the equipment in safe operating condition at its own expense. Once a year each party to a lease has the opportunity to cancel the agreement.

■ Courts will withhold relief in a patent infringement suit where the patentee and those claiming under him are using the patent privilege contrary to the public interest, as where there is an unlawful attempt to extend the patent monopoly over unpatented material. 69 C.J.S., Patents, § 313, page 903. Since the date of the decision in Motion Picture Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, the Supreme Court has consistently held that the owner of a patent may not employ it to secure a limited monopoly of an unpatented material used in applying the invention. Carbice

Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 788, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367. True, these cases involve the use of a patent for a machine or process to secure a partial monopoly of supplies consumed in its operation or unpatented materials employed in it. However, in Mercoid Corp. v. Mid-Continent Investment Corp., 320 U.S. 661, 665, 64 S.Ct. 268, 271, 88 L.Ed. 376, the court, after referring to these cases said, " * * * But we can see no difference in principle where the unpatented material or device is itself an integral part of the structure embodying the patent."

■ In determining when the courts will interfere with a patentee's right to sue an infringer, "it is necessary to consider whether the exercise of the patent monopoly will result in a limited monopoly in an unpatented commodity as a practical matter, and whether the patentee seeks to derive profit, not from the invention itself, but from unpatented supplies used therein; and ordinarily the courts will refuse to grant any relief in an infringement action that will serve to aid the patentee's attempts unlawfully to extend his patent monopoly over unpatented material." 69 C.J. S., Patents, § 313, page 904. See also: American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207.

Defendant claims that the effect of the lease agreement is to enable plaintiff to control the accessories and materials unpatented by plaintiff that are used in the unit in combination with its patented airdox cartridges. Defendant also claims that every lessee of an Airdox Unit is in fact restrained as a prospective purchaser of defendant's cartridges because under the airdox lease, the lessee must pay plaintiff 6¢ a ton, irrespective of whether the cartridges he uses are airdox or those manufactured by defendant; that if a lessee preferred to use defendant's cartridges, it would nevertheless have to pay the full rent under the lease for the use of the Airdox Unit. De-

fendant points to the practice of the plaintiff in the past of not leasing or selling separately the cartridges or other component parts of the Airdox Unit.

Plaintiff argues that its lease contains no tie-in clause, but that the lessee of an Airdox Unit may purchase unpatented materials and equipment similar to those used in the Airdox Unit from whomever he may choose; that there is no provision in the lease that lessee cannot use a compressor, motor, or other part of the unit which he might obtain from someone other than the plaintiff.

The Supreme Court has pointed out that it is not necessary that the lease or other contract contain express provisions of a tie-in or other agreement limiting competition. The actual realistic effect upon competition is important. In International Salt Co., Inc. v. United States, 332 U.S. 392, 398, 68 S.Ct. 12, 16, 92 L.Ed. 20, the court said: "Rules for use of leased machinery must not be disguised restraints of free competition, though they may set reasonable standards which all suppliers must meet."

In Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672, the court held that an appearance of freedom from abuse of patent by imposing on licensees, either as a condition of license, or otherwise, any requirement, condition, agreement or understanding as to purchase or use of unpatentable commodities, is not conclusive, if it conceals a subterfuge and if there is real, although informal, restraint. In Mercoid Corp. v. Mid-Continent Investment Corp., et al., 320 U. S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376, there was a combination patent, and one of the elements of the patented device was an unpatented stoker switch. The complaint alleged contributory infringement. The court there held that the owner of a system patent may not use it to secure a limited monopoly of an unpatented device employed in practicing the invention, even though the unpatented device is itself an integral part of the patented system. The court said, 320 U.S. at page 667, 64 S.Ct. at page 272: "* * * Mr. Justice Brandeis, speaking for the Court, stated in the Carbice case that 'Control over the supply of such un-

patented material is beyond the scope of the patentee's monopoly; and this limitation, inherent in the patent grant, is not dependant upon the peculiar function or character of the unpatented material or on the way in which it is used.' 283 U.S. page 33, 51 S.Ct. page 336, 75 L.Ed. 819. We now add that it makes no difference that the unpatented device is part of the patented whole."

█ The trial court made a finding of fact that the plaintiff's lease did not contain a tie-in clause. We regard this as a conclusion of law. In any event the wording and contents of the lease agreement are not in dispute. There likewise is no conflict in the evidence as to the past business practice of plaintiff in only leasing its patented cartridges as part of a unit together with the unpatented compressor and other components. Although the question is not free from doubt, it is our view that under the authority of the cases cited, plaintiff's conduct constituted a misuse of its patents, by unlawfully extending and attempting to extend the monopoly of its patents.

Judgment reversed, with instructions to dismiss the complaint.