## BULLDOG ELECTRIC PRODUCTS CO. v. WESTINGHOUSE ELECTRIC CORPORATION.

### No. 254, Docket 20538.

Circuit Court of Appeals, Second Circuit.

July 29, 1947.

Dean, Fairbank & Hirsch and Harry Price, all of New York City (Daniel G. Cullen and Abraham J. Levin, both of Detroit, Mich., of counsel), for appellant.

Victor S. Beam and Thomas J. Byrne, both of New York City, and Ralph H. Swingle, of East Pittsburgh, Pa., for defendant-appellee.

Before L. HAND, CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from a declaratory judgment of the District Court for the Eastern District of New York in which U. S. Pat. No. 2,285,770 granted to Frank and Messing on June 9, 1942 for a circuit breaker was held not infringed by the defendant's so-called Multi-breaker circuit breaker and its enforcement enjoined. The question of validity was not decided.

The plaintiff, a West Virginia corporation, sued the Cole Electric Products Company, Inc., a New York corporation, and the appellee, a Pennsylvania corporation, to recover for the infringement of a number of patents relating to what is called a bus duct, which has nothing in common with a circuit breaker except that both are used in electrical systems. The plaintiff had advised this appellee that its Multi-breaker was an infringement of the above patent, and the appellee filed a counterclaim for a declaratory judgment that it did not infringe and for an injunction. The plaintiff answered, and by leave of court amended its answer to the counterclaim to allege the infringement of its circuit breaker and issue was joined on these pleadings. This appeal is only from that part of the judgment entered in the bus duct suit which relates to the circuit breaker patent and Cole Electric Products Company, Inc., is not a party hereto.

Questions are raised not only as to infringement and validity but also as to the assertion by the appellant that error was committed at the trial by the exclusion of evidence offered to show that the appellee was guilty of unlawfully monopolizing, or attempting to monopolize, the circuit breaker business, to restrain trade therein, and to drive the appellant from that field. A suit brought by the appellee against the appellant in the Northern District of West Virginia to recover for the alleged infringement of several of the appellee's patents on circuit breakers was pending and the appellant unsuccessfully attempted to have the entire controversy as to circuit breakers tried in one suit, offering the appellee its choice of forums. As the trial court, however, had jurisdiction it was, of course, acting within that jurisdiction in hearing and deciding this controversy.

A circuit breaker is just what its name implies. It is a device added to an electrical circuit which will open it whenever an overload, if allowed to continue, would endanger or damage the circuit. Such devices were old and numerous when the alleged invention of the patent in suit was made. They may be described for present purposes as switches which may be opened and closed manually and also may be opened, but not closed, automatically. This automatic action is entirely independent of the manual opening and is the result of the action of the heat generated by an electrical overload which causes a bimetal strip to bend and release a latch. That in turn permits a spring to pull the contacts apart, usually with a snap action as in the patent in suit though that feature is admittedly old and not relied on.

The history of the Frank and Messing patent is rather interesting and significant in that it shows that any invention of theirs must be found, if at all, in connecting a movable resilient bridge contact to an oper-

996

ating mechanism. These two men, with Alfred J. Thomson, filed a joint application on March 6, 1933, Serial No. 659,714, for a patent in which four circuit breakers were described. After three of them were eliminated and both Frank and Messing had withdrawn as applicants, a patent for a circuit breaker, No. 2,102,295 was, on December 14, 1937, granted to Thomson alone. The drawings of this patent were the same as those of the patent in suit and showed both an operating mechanism and a contact linked to that mechanism. These three men agreed that Thomson was the sole inventor only of the operating mechanism and that was duly made to appear on Thomson's application for reissue, filed on September 9, 1940, granted on April 1, 1941 and which became Reissue No. 21,760 for the operating mechanism only. When, thereafter, Frank and Messing filed their first application for a patent on what they claimed to have invented and had included in the joint application with Thomson, they copied a claim in an application for a patent by one Swingle, and, an interference having been declared and decided adversely to Frank and Messing, they abandoned that application. It was after this that they filed the application which matured into the patent in suit, but only after it had been rejected by the examiner, the rejection affirmed by the Board of Appeals, and the decision reversed by the Court of Customs and Patent Appeals. See In re Frank, 123 F.2d 820, 29 C.C.P.A., Patents. 713.

Figs. 4 and 5 of the drawings are reproduced on page 822 of that opinion and they may for convenience and clarity be referred to in connection with the following description of the invention Frank and Messing claimed in claim 2 of the patent in suit which is the sole claim now relied on.

The operating mechanism covered by Thomson's reissue is shown in the upper part of each drawing and consists of all but the fixed contacts in the base, the resilient contact arm 13, the base guide below it and the linkage above it by which the contact arm is made responsive to the movement of Thomson's operating arm 24. This linkage is slotted at 25 and 26, to add lost motion which insures snap action, but

nothing here turns upon that. What is claimed to be the invention is the attachment of the upper link 22 to the operating arm 24 by pin 23 at a point which is remote from the point where the arm is connected to the handle at 39. The advantage thus gained is one of greater upward movement since Thomson's operating mechanism is so contrived that when the bimetal strip 14 bends to release the latch which holds at 36, the entire operating mechanism pivots at 33 and swings upward around that point under the influence of spring 27. This spring exerts reverse action upon the operating arm dependent upon whether the latter is above or below "dead center," that is, above or below the pivot 43 upon which the handle, 42, turns. But this characteristic is a part of Thomson's invention and the operating arm 24 will move upward on pivot 33 in exactly the same way no matter where the linkage connecting it with the movable contact is attached to it. The more remote the point of attachment is from 33, the greater the upward movement of the linkage. The selection of the point of attachment to have the desired amount of upward motion imparted through the linkage to the movable contact is no more than designer's choice and falls short of invention. Given the Thomson operating mechanism to start with, it would certainly be likely that any skilled mechanic would choose the most desirable point on the operating mechanism to attach his connection to the movable contact, and that is all Frank and Messing did in this respect.

██ With deference, we must disagree with the decision in re Frank, supra, and hold this patent invalid. In all likelihood the result there would have been different if patent No. 1,941,210 granted to Hurlburt and Vogel for an electric switch on December 26, 1933, on an application filed January 5, 1931 had been considered. Those patentees broke the circuit by using a movable contact of the resilient bridge type connected to an operating arm which was moved up or down by moving a handle. This movement of the handle turned a disk on which a pin engaged a slot in one end of the operating arm and moved that arm up or down on a pivot at its other end. The

resilient bridge contact connected to it moved with the arm and opened or closed the switch accordingly. The point on the operating arm at which the connection to the movable contact was attached to the arm was "remote" from the handle. And so it becomes abundantly clear, that in teaching the art to connect the linkage to a point on the operating arm remote from the handle, Frank and Messing not only taught what was obvious, but what Hurlburt and Vogel had already disclosed in their patent. This slight modification of the Hurlburt and Vogel movable contact and its connection to the arm did not require that something, more than the skill of the calling, which is needed to support the grant of a patent. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005; Bilofsky v. Westinghouse Electric Supply Co., 2 Cir., 160 F.2d 154. They did no more than use old ways and means to do just what had been done before. Detrola Radio & Television Corp. v. Hazeltine Corp., 313 U.S. 259, 61 S.Ct. 948, 85 L.Ed. 1319.

We prefer to put our decision on the ground that the patent is invalid, rather than upon noninfringement, though we agree with the trial court that even if the patent had been valid it would not have been infringed by the appellee's Multibreaker. The last-named device has no separate operating arm connected to a movable contact at a point remote from a handle. Its operation is much simpler and quite different. It has an arm which is held in the closed circuit position by a spring beneath it at about its mid point. At one end of this arm a contact point soldered to it is pushed against a stationary contact to close the circuit. The other end of the arm is caught beneath the end of a bimetal strip which serves as a latch. The electrical connection to this arm is flexible.

Upon an overload, the bimetal strip is heated and bends to release that end of the arm which jumps up as the underlying spring expands when the latch is thus tripped. The contact end of the arm at the same time moves down away from the stationary contact to open the circuit as the arm pivots on a stirrup at a point between the spring and the contact end. The contact may then be closed by moving a handle pressing on the stirrup which pushes the arm down and lets the tension of the spring push the movable contact against the stationary one. The contact may be manually broken by moving the handle in the direction opposite from the closing movement.

There remains to be considered the claimed error in excluding the offered proof of the appellee's monopoly of, or attempt to monopolize, the circuit breaker field. It is asserted by the appellant that the appellee is not entitled to injunctive relief on its counterclaim from the threat of this patent since it does not, because of its alleged violation of the anti-trust laws, come into court with clean hands. That a controversy about this patent does exist is not questioned and, indeed, the appellant's own amended pleadings show that. The situation under the pleadings is now no different than it would have been, had the appellant followed its notice of infringement by bringing suit on this patent.

It could not then have gained any advantage in its suit on an invalid patent by showing that it was seeking to enforce it against one who had violated the anti-trust laws. Bulldog Electric Products Co. v. Cole Electric Products Co., 2 Cir., 148 F.2d 792. No more may it do so because the suit was initiated differently. The public interest requires that the threat of an invalid patent be removed whenever its enforcement is sought whether or not the active contestant of the patent's validity would be entitled to equitable relief in its own right. See Trott v. Cullen, 10 Cir., 86 F.2d 141.

Judgment affirmed.