VANITY FAIR MILLS, Inc.,
Plaintiff,

v.

Will E. CUSICK, Will E. Cusick Company, and Beautiflute, Inc., Defendants.

No. C 51–55.

United States District Court
D. New Jersey.

July 6, 1956.

the individual defendant, Will E. Cusick. This patent covers a fluted fabric and a method of making the same. The chief use of this fabric is as a trim for ladies' undergarments, particularly slips. Will E. Cusick has assigned the patent to defendant Beautiflute, Inc. and the fabric is being manufactured by defendant Will E. Cusick Company under a license from Beautiflute. The issuance of the patent to Cusick was announced to the garment industry on December 29, 1954 by a full-page advertisement printed over the name of Beautiflute, Inc., in the Women's Wear Daily, a trade newspaper. This advertisement warned manufacturers of the consequences of infringement and gave retailers and wholesalers thirty days in which to clear their stocks of infringing merchandise without incurring liability.

Plaintiff, a manufacturer competing with the Will E. Cusick Company in the sale of garments trimmed with fluting, filed its complaint in this case on January 4, 1955. It alleges the invalidity of the Cusick patent on many grounds, and asks for a declaration of the patent's invalidity or, in the alternative a declaration of noninfringement by Vanity Fair. Noninfringement is not an issue before the court at this time. The complaint also contains a count for unfair competition, which seems to be based mainly on allegedly inflated public claims of the scope of the Cusick patent. However, the merits of the unfair competition count are not in issue at present.

Defendants' amended answer contains a denial of the allegations of invalidity of the Cusick patent. It also contains a counterclaim which accuses the plaintiff, Vanity Fair, of violating § 3 of the Robinson-Patman Act, 15 U.S.C.A. § 13a [1],

McCarter, English & Studer, by Ward J. Herbert, Newark, N. J., for plaintiff. Toulmin & Toulmin, by H. A. Toulmin, Jr., William H. Pavitt, Jr., Washington, D. C., of counsel.

Norman Popper, Newark, N. J., for defendants.

FORMAN, Chief Judge.

On December 28, 1954 the Patent Office issued U. S. Patent No. 2,698,009 to

1. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or contract to sell, which discriminates to his knowledge against competitors of the purchaser, in that, any discount, rebate, allowance, or advertising service charge is granted to the purchaser over and above any discount, rebate, allowance, or advertising service charge available at the time of such transaction to said competitors in respect of a sale of goods of like grade, quality, and quantity; to sell, or contract to sell, goods in any part of the United States at prices lower than those

by granting discriminatory advertising allowances to its customers. The specific charge of the counterclaim, as amplified by depositions and affidavits, is that this discrimination in advertising allowances was aimed directly at the Will E. Cusick Company by Vanity Fair. It is said that the discriminatory allowances were made to retailers of Vanity Fair who were in direct competition with retailers selling Cusick's product for the purpose of enabling retailers selling Vanity Fair products to undersell the Cusick product.

The defendants also allege that plaintiff's purported violation of the Robinson-Patman Act bars the plaintiff from maintaining both its patent infringement and unfair competition actions. Guilt of the violation charged in the counterclaim is pleaded as a defense to the relief demanded in the two counts of the complaint.

Vanity Fair now has three separate motions before the court. The first is a motion under Rule 12(f), Fed.Rules Civ.Proc., 28 U.S.C., to strike the defenses to the counts of invalidity and unfair competition as insufficient in law to bar recourse to the relief requested. The second is a motion for summary judgment under Rule 56 on the counterclaim and the third reaches the issue at the core of this case; it is for summary judgment on the question of the validity of the Cusick patent.

I—The Motion to Strike the Defenses
A. The Defense of Unclean Hands to the Charge of Invalidity of the Cusick Patent.

The defendants' precise position is that they should be permitted to prove that plaintiff has violated the Robinson-Patman Act by granting discriminatory advertising allowances and that such proof will deprive plaintiff of the remedy it seeks upon application of the clean hands doctrine. A general statement of the clean hands doctrine is found in a case relied on by defendants, Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 244–246, 54 S.Ct. 146, 147, 78 L.Ed. 293:

"The meaning and proper application of the maxim are to be considered. As authoritatively expounded, the words and the reasons upon which it rests extend to the party seeking relief in equity. 'It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands. * * *' * * *

"But courts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. * * * They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."

In the Keystone case the plaintiff was suing for infringement of four related patents. In defense to the claim of infringement the defendant showed that plaintiff before applying for one of the

exacted by said person elsewhere in the United States for the purpose of destroying competition, or eliminating a competitor in such part of the United States; or, to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor."

patents knew of a prior use thereof and corruptly suppressed evidence of this prior use. It was held that this circumstance deprived the plaintiff of the right to sue for infringement of all four patents on the ground that it did not come to court with clean hands. See also Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381.

■ Obviously, Vanity Fair will not be prevented from seeking relief simply because it is violating federal law in the administration of its business policies. The inequitable conduct asserted as a defense must bear an intimate relation to the rights urged by the plaintiff before it can be utilized effectively by a defendant through application of the clean hands doctrine. Defendants seek to show the necessary intimacy by pointing out that the allegedly discriminatory advertising allowances have been granted by plaintiff only in "spots" where they make up lost profits to retailers who, presumably on instructions from Vanity Fair, are cutting prices on Vanity Fair's No. 3–8–3 slip which is in direct competition with the Cusick slip No. 6000 using material made with the patented process. Furthermore, it is defendant's position that the discriminatory advertising allowances are granted only with regard to the No. 3–8–3 slip—the Vanity Fair product in most intense competition with the Cusick product—and apparently are not granted in relation to the sale of other Vanity Fair merchandise. Thus, it becomes defendants' position that Vanity Fair has engaged in conduct violating federal trade regulatory laws for the purpose of destroying through unfair competition effective commercial utilization of the patent monopoly granted to Cusick and that having attempted this Vanity Fair should not now be permitted to come into court and seek the same goal by litigating the validity of the Cusick patent.

These allegedly illegal trade practices of the plaintiff do not bear the "immediate and necessary relation" to the relief sought by Vanity Fair that must be found before the clean hands maxim can be applied. They have nothing to do with the patent in question itself, but are competitive practices directed at the product produced by the patent. Unlike the plaintiff in the Keystone case, supra; this plaintiff is not coming to court with an advantage gained by inequitable conduct. Assuming that Vanity Fair has done all the things alleged by defendants, that does not help it establish the issue it has brought here—the invalidity of the Cusick patent. No unfairly advantageous position has been or could be attained in relation to that issue by violating the Robinson-Patman Act. It is the Cusick patent, not its own business practices, that plaintiff has placed in controversy by bringing this suit. The relationship between the patent and the manner in which plaintiff conducts its business is certainly not "immediate" to the issues of validity or invalidity of the patent.

This result is firmly supported by the few cases in which unfair trade practices or anti-trust violations have been asserted as "unclean hands" defenses to claims of patent invalidity. In Bulldog Electric Products Co. v. Westinghouse Elec. Corp., 2 Cir., 1947, 162 F.2d 994, the patent in issue was held invalid on defendant's counterclaim. In defense to the counterclaim plaintiff sought to prove defendant's attempted monopolization of the same industrial product that concerned plaintiff's patent. The defense was held insufficient, the court intimating that the clean hands doctrine was unavailable as a bar to assertions of patent invalidity:

> "The public interest requires that the threat of an invalid patent be removed whenever its enforcement is sought whether or not the active contestant of the patent's validity would be entitled to equitable relief in its own right. * * *" 162 F.2d at page 997.

District courts, too, have seen this problem in the same light. Buromin Co. v. National Aluminate Corporation, D.C. D.Del.1947, 70 F.Supp. 214, was a suit in

which the defendant sought to set up "unclean hands" as a defense to plaintiff's claim of invalidity of defendant's patent. The specific charge was that the plaintiff was attempting to monopolize unpatented material through misuse of the patent laws. After examining Keystone Driller Co. v. General Excavator Co., supra, Judge Rodney held:

"It is not apparent that the alleged improper conduct of the plaintiffs has an immediate or necessary relation to the validity or invalidity of the defendant's patent." 70 F.Supp. at page 217.

Accord: Container Co. v. Carpenter Container Co., D.C.D.Del.1948, 8 F.R.D. 208; Landis Mach. Co. v. Parker-Kalon Corporation, D.C.S.D.N.Y.1947, 73 F.Supp. 421.

The defense to the first count of the complaint (plaintiff's assertion that the Cusick patent is invalid) will be stricken.

B. The Defense of Unclean Hands to Plaintiff's Allegation of Unfair Competition.

■ Defendants also set up plaintiff's alleged violations of the Robinson-Patman Act in defense to plaintiff's count for unfair competition. The essence of plaintiff's charge in this respect is that defendants, when announcing the grant of the fluting patent to Will E. Cusick in the Women's Wear Daily of December 29, 1954, made inflated claims as to the patent's scope. Plaintiff implies that this claim caused its customers to refrain from purchasing noninfringing merchandise from it to its damage. Defendants' position now is that since plaintiff has used illegal means in trying to prevent them from making a profitable commercial exploitation of their patent rights, plaintiff should not be permitted to collect damages based on illegal use of the patents. Since this suit was started only a few days after the patent was granted it is difficult to see how much harm plaintiff has been able to do to sales under the patent by the defendants. Even if the illegal acts attributed to plaintiff were, as alleged, aimed at driving Cusick out of business, that circumstance bears no "immediate and necessary relation" to plaintiff's charge that the patent is being unfairly manipulated. Once defendants' charge that plaintiff's conduct was aimed specifically at their patent rights (a charge that is not made in the pleadings) is put to one side for the reason that there has been no time in which plaintiff could have engaged in illegal activity harmful to the patent, it becomes apparent that there is no intimate relation between plaintiff's alleged conduct generally harmful to the defendants and the specific charge made against them now—that they have made public assertions considerably in excess of the actual area covered by their patent. The principles of the Keystone case, supra, require that the defense to the second (unfair competition) count of the complaint should be stricken also. See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219, where it was held no defense to a private anti-trust suit that the plaintiff was guilty of the same kind of anti-trust violation for which he sought redress. See also Shaver v. Heller & Merz Co., 8 Cir., 1901, 108 F. 821, 834, 65 L.R.A. 878. Compare Singer v. A. Hollander & Son, Inc., 3 Cir., 1953, 202 F.2d 55.

## II—The Motion for Summary Judgment on the Counterclaim

The counterclaim charges that Vanity Fair has discriminated "in pricing its merchandise of identical quality and grade directly and indirectly against various of its customers, with effect to substantially lessen competition * * *." It is further charged that the discrimination is effected through the payment of a discount or rebate or advertising allowance. Sales made at unreasonably low prices for the purpose of destroying the competition between Vanity Fair and the Will E. Cusick Company are also alleged.

■ There is not a single basic fact before the court which would sustain these accusations. The deposition of

Will E. Cusick and the other depositions and affidavits, submitted by the defendants on this motion, as well as the counterclaim, contain nothing but conclusory statements or "ultimate" facts. Much of Cusick's deposition is phrased in terms of his "opinion".

It is not necessary to relate in detail the factual complex out of which the counterclaim arose. But it may be summarized briefly.

Will E. Cusick was an employee of the plaintiff, Vanity Fair. He left its employ in 1944. In his capacity there he gained knowledge of its advertising plan, which at that time restricted the amount of cash advertising allowance to a defined percentage of Vanity Fair's sales to that customer.

Cusick gained his knowledge of the quantity of advertising featuring Vanity Fair's merchandise done by Vanity Fair's customers through material sent to him by a clipping service to which he subscribed. He noted that the quantity of advertising done by several stores was far in excess of that done by other Vanity Fair customers. Since he could not believe that retailers would pass up offerings of substantial advertising allowances, and further since he was sure that the heavy advertisers were not themselves financing such a quantity of advertisements featuring Vanity Fair merchandise, Cusick concluded that Vanity Fair was favoring some of its retailers with excessive advertising allowances.

What Cusick did not know was that in 1947 Vanity Fair changed its advertising allowance policy. It then adopted a plan whereby it would pay one-half of the cost of any advertising done by its customers which featured Vanity Fair merchandise and met several other conditions imposed by Vanity Fair. The affidavit of an officer of Vanity Fair setting forth this change of policy is un-

challenged by the defendants. All of the material sent to Cusick by his clipping service upon which he relied in making the charges contained in the counterclaim concerned advertisements made by Vanity Fair's customers when the 1947 policy (or as amended in 1951) was in effect. The counterclaim is based on a misconception of fact.

The charge that Vanity Fair sold its fluted products at unreasonably low prices rests upon the same factual error. The defendants' contention in this regard involves three principal steps. (1). Vanity Fair sold its No. 3–8–3 slip at about the same price as the defendants obtained for their No. 6000 slip. (2) Vanity Fair's overhead expenses are considerably higher than those of the defendants. (3) The defendants' No. 6000 slip was bringing only a minimum of profit, if any. Therefore, Vanity Fair must be selling its No. 3–8–3 slip at unreasonably low prices. It is easily seen that the key step in this progression is the allegation that Vanity Fair's overhead is in excess of the defendants'. No facts are submitted which tend to sustain this charge. It is sought to be supported by the argument that since Vanity Fair was giving excessive advertising allowances, including the allowances as expenses inflates Vanity Fair's overhead considerably above the defendants' who had no comparable expenditure to make.[2] Thus, once the charge that Vanity Fair was giving excessive advertising allowances fails, the accusation that it was selling at unreasonably low prices also fails.

Defendants cite Frederick Hart & Co. v. Recordgraph Corporation, 3 Cir., 1948, 169 F.2d 580, in an effort to fend off summary judgment for the plaintiff on the counterclaim. That case laid down the rule for this Circuit that "An affidavit cannot be treated, for purposes

**2.** Cusick Company does not give advertising allowances to its customers. Instead, it permits them to place their own brand labels on the merchandise bought from it, on the theory that individual stores will more readily pay for advertising when their own name is being stressed. This is called a "unique" method of merchandising eliminating the need for national brand names and keeps down the Cusick's company's operating expenses.

of the motion to dismiss, as proof contradictory to well-pleaded facts in the complaint." 169 F.2d at page 581.[3]

 The Hart case goes no further than to require that in the search for fact issues the court must also consider those facts contained in the pleadings and cannot require that they be reiterated in affidavit form. The Hart case is not authority for the proposition for which the defendants seek to use it—that the conclusory allegations of the counterclaim, denied by plaintiff, raise fact issues foreclosing the grant of summary judgment. The Hart case merely broadens the area in which the search for fact issues must be made; it in no way impairs the principle that specific, basic facts must be alleged and controverted before the "genuine" issue contemplated by Rule 56 arises. This requirement is of course not satisfied by the generalities contained in the counterclaim. It will not do, as defendants have done, to charge that there has been price discrimination and yet not say specifically who has been discriminated against and instead offer Will E. Cusick's opinion that certain advertising by Vanity Fair's customers is "excessive".

Plaintiff's motion for summary judgment on the counterclaim will be granted.[4]

### III—The Motion for Summary Judgment Declaring the Cusick Patent Invalid

The patent itself, No. 2,698,009, contains nine claims. The patent is so constituted, however, that the claims are non-severable, and all will stand or fall together.

What is patented is a fluted fabric and a method of making the same. To attain the desired fluted effect a material is woven in alternating rows of loose and close wales. This gives the material a striped effect, for the tightly-woven strips are more opaque than the remaining rows. As yet, however, the surface of the material is flat and unruffled. Cusick purchases this material already woven, and claims no patent on it. He then treats this material with steam which he claims causes it to shrink to one-third of its original size. As the material shrinks, the tightly-woven strips rise from the surface and become rounded, leaving a very eye-pleasing surface of rows of crests and valleys in the material. A cursory inspection of the fluted product reveals that its appearance is similar to the familiar pleating, which is obtained by gathering uniformly woven material in a series of folds. Fluting, however, is distinctly different in that it has no

---

3. In many other circuits, see cases cited in 6 Moore's Federal Practice, 56.11(3), n. 21, and in the state courts of New Jersey, Judson v. Peoples Bank, 1954, 17 N.J. 67, 73–77, 110 A.2d 24, a party opposing a motion for summary judgment who finds the allegations of his pleadings controverted by his opponents cannot rely on his pleadings alone to preclude summary judgment, but has the duty to restate his facts by deposition or affidavit. This is the tenor of the Supreme Court Advisory Committee's proposed amendment to Rule 56, and in which the addition of the following language to Rule 56(e) is advocated:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

If he does not so respond, summary judgment, if appropriate, shall be entered against him." Report of Proposed Amendments to the Rules of Civil Procedure for the United States District Courts (October 1955), pp. 56–57, as Prepared by the Advisory Committee on Rules for Civil Procedure.

4. After this case was fully argued and awaiting decision plaintiff called the court's attention to Vance v. Safeway Stores, D.C.D.N.M.1956, 137 F.Supp. 841. In that case it was held that section 3 of the Robinson-Patman Act is a criminal statute only, and that it does not afford a private right of action for treble damages. This question has not been considered here, however, because the parties have not had an adequate opportunity to brief and argue it, and because it would not change the result reached by consideration on the merits of the motion for summary judgment for the plaintiff on the counterclaim.

folds; that the raised effect is the natural shape of the material after shrinking, and in its superior ability to retain its shape.

The patent claims as invention the method of treating the specially woven material with steam in order to cause the desired degree of shrinkage and the finished product, the fluted material itself.[5]

The first ground plaintiff urges as invalidating the Cusick patent is that it was in public use more than a year prior to Cusick's application on April 27, 1953. This argument is based on 35 U.S.C. § 102(b), which is as follows:

"A person shall be entitled to a patent unless—

\* \* \* \* \* \*

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States \* \*."

By his own admission, as early as 1950, Cusick was manufacturing and selling slips trimmed with fluted material. The fluting on these early slips differed from the patented product only in that it was manufactured from material shrunk to one-half its original size. This 50 percent shrunk fluting was made at the Cusick Company's plant at Keyport, New Jersey and was made by subjecting nylon woven into alternate rows of loose and close wales to steam. Shrinkage of 50 percent would occur.

It was not until the Cusick Company took over a new plant at Lansdale, Pennsylvania in July 1952, that shrinkage of 66⅔ percent was obtained. Cusick's testimony on oral examination by plaintiff is clear that the difference in production method used in the new plant was the subjection of the specially-woven nylon to steam under 60 pounds pressure. This was possible because of more effective equipment acquired with the new plant.

It seems plain from Cusick's own testimony that the patented method of manufacture was in use for three years before the application was made to the patent office on April 27, 1953. Whatever invention exists in the method of making this product had been extensively used more than a year prior to April 1953, and the product created by use of this method extensively sold. The use of steam under pressure to attain a greater degree of shrinkage constitutes a common-sense improvement of the original method and not an "invention" over Cusick's own prior art. The patentee's prior use defeats his patent. Jenner v. Bowen, 6 Cir., 1905, 139 F. 556. And there can be no doubt that the prior use was "public" within the meaning of the statute. Smith & Griggs Mfg. Co. v. Sprague, 1887, 123 U.S. 249, 8 S.Ct. 122, 31 L. Ed. 141.

Defendants sought to bring themselves within Judge Learned Hand's interpretation of 35 U.S.C. § 103[6] in Lyon v. Bausch & Lomb Optical Co., 2

5. Claim 1 asserts invention in a method using a single shrinkable material treated with steam to produce a shrinkage of 66⅔%. Claims 2, 3, and 4 concern a finished product treated according to the method of Claim 1 and made of wool, silk, and rayon respectively Claim 5 asserts invention in a method using two different materials, one of which is shrinkable, and treatment with steam to obtain shrinkage of 66⅔%. Claims 6, 7 and 8 assert invention utilizing several different knitting styles and the steam treatment to obtain shrinkage of 66⅔%. Claim 9 is identical with Claim 1 except that the shrinkage is occasioned by treatment with

hot water instead of steam to obtain 66⅔% shrinkage.

6. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Cir., 1955, 224 F.2d 530. Judge Hand there wrote that in enacting § 103 Congress intended to lower the standard of invention. This is contrary to the interpretation placed upon § 103 by the Court of Appeals for this Circuit, Stanley Works v. Rockwell Mfg. Co., 3 Cir., 1953, 203 F.2d 846. See also Fisch v. Gould, D.C.D.N.J.1956, 141 F.Supp. 2. But taking the words of the section literally, it is inescapable that to obtain increased shrinkage by increasing steam pressure is an improvement that "would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *."

■ There is a further ground on which this patent may be held invalid and that is the ground of insufficient disclosure under 35 U.S.C. § 112:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

At the heart of this statute is the public policy of exacting disclosure of the invention in return for the 17-year monopoly, so that the public will have knowledge with which to use the invention when the private monopoly expires. See Stedman, Invention and Public Policy, 12 Law and Contemp.Problems 649 (1947). This policy is unsatisfied if the description of the invention is inadequate "to enable any person skilled in the art * * * to make and use the same * * *" and a patent failing to satisfy this policy is void. Permutit Co. v. Graver Corp., 1931, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163.

Nowhere in the patent is the fact that steam under a pressure of approximately 60 pounds must be used in order to attain the patented 66⅔ percent shrinkage. And yet it is undeniable that the vital difference between the unpatented and unpatentable prior method used by Cusick in which he obtained 50 percent shrinkage and the patented method in which shrinkage of 66⅔ percent is obtained is the use in the latter method of steam under a pressure of approximately 60 pounds. Cusick's own testimony upon oral examination by the plaintiff on January 21, 1955 shows this (Transcript, p. 89):

Direct Examination by Mr. Pavitt:

"Q. Now, as I understand it then from your prior testimony, the only difference between the method employed in arriving or, rather in producing garments of the type of plaintiff's exhibits 4 and 7,[7] and the method used in plaintiff's exhibit No. 5,[8] is in the steaming process. Is that the only difference? In other words, the manner in which you steam differs from the manner in which you currently steamed that garment? A. Yes, the manner very definitely differs.

"Q. Is that the only difference? A. Well, the fabric, as far as I know, is knitted the same.

"Q. The fabric is the same. So that it is only the steam, and before you had steam which was not particularly well controlled. Is that it? A. That's right.

"Q. And under a pressure which was, I suppose substantially less than 60 pounds, or whatever you use today? A. Much less than 60 pounds, certainly unknown."

The patent simply recites that shrinkage is obtained by the use of steam and, in Claim 9, hot water. But since it is clear that anyone following the direc-

---

7. These exhibits had been previously identified as samples of the Cusick Company's product at a time when it was obtaining only 50% shrinkage in its manufacture of fluting.

8. This exhibit had previously been identified as a sample of current production of the Cusick Company (66⅔% shrinkage).

tions of the patent and using steam not under pressure or hot water would obtain only the unpatentable 50 percent shrinkage, it is plain that this patent must fail for want of adequate description.[9]

Plaintiff may have a judgment striking the defenses to counts 1 and 2 of the complaint; granting summary judgment for the plaintiff on the counterclaim, and declaring the patent invalid. An order in conformity herewith should be settled upon due notice.

---

9. Plaintiff also posits invalidity on lack of invention over the prior art and that the patent is an attempt to monopolize a natural function (shrinking). However, since the patent is invalid on the grounds discussed in the text above, these issues need not be reached.