## TROTT et al. v. CULLEN et al. [*]

### No. 1329.

Circuit Court of Appeals, Tenth Circuit.

Oct. 23, 1936.

[*] Rehearing denied 87 F.(2d) 200; writ of certiorari denied 57 S. Ct. 511, 81 L. Ed. ——.

PHILLIPS, Circuit Judge, dissenting.

———◆———

Carlton Hill and George I. Haight, both of Chicago, Ill. (Forrest C. Northcutt, of Denver, Colo., on the brief), for appellants.

Merrell E. Clark, of New York City, and Morrison Shafroth, of Denver, Colo. (W. W. Grant, Jr., of Denver, Colo., J. King Harness, of Detroit, Mich., and Grant, Ellis, Shafroth & Toll, of Denver, Colo., on the brief), for appellees.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

On July 4, 1931, the Chrysler Corporation announced that cars of its manufacture would thereafter eliminate power tremors by the use of "floating power"—a term used to describe a method of supporting the power unit in such a manner that engine vibration is largely neutralized by permitting it to rock about the center of weight.

Rolland Trott had theretofore grappled with the problem and had two applications for patent pending, No. 1,890,871 dated November 24, 1928, and No. 1,834,907 dated May 27, 1929. He and his licensee, the Borg-Warner Corporation, had negotiated with Chrysler for a license and had demonstrated a car with the engine mounted as described in one of his patent applications. The negotiations were broken off just before they appeared to be nearing a successful conclusion, and shortly before Chrysler came out with floating power.

Trott then applied for new and amended claims which were allowed—'871 going to issue on December 13, 1932, and '907 on December 1, 1931. On November 10, 1931, '907 was divided and 1,897,014 issued to cover the division. Trott and his assignee then brought this suit alleging infringement of claims issued after Chrysler's announcement, the claims now in controversy being 30 to 37, inclusive, of '871, all 14 claims of '907, and all 10 claims of '014. The defenses were conventional. After an extensive trial, the court below held all the claims in controversy anticipated and invalid for lack of invention, and that there was no infringement as to claims of '871 in suit.

The mechanical problem for which Trott sought a solution—to keep engine vibration away from the occupants of the car—was one which had had the attention of engineers and inventors for many years. In internal combustion engines, the power generated by the explosion of fuel is transmitted to the wheels through a rotating crank shaft; a rod, pivotally mounted, connects the piston with the crank shaft. The thrust of this connecting rod against the crank shaft is at a slight angle and there is an inevitable rebound from the thrust which causes the motor to vibrate. This reaction to the force of the piston thrust is called torsional or torque reaction.

If the motor were rigidly attached to the car, the resulting vibration would be terrific, and almost from the inception of the industry steps have been taken to dissipate or deaden that vibration. Various familiar resilient means—rubber, leaf and coil springs, etc.—were used. As will later be seen, it was proposed at least as early as 1920 to let the engine rock or oscillate within reasonable limits. If the axis of oscillation did not coincide with the axis of the center of mass of the unit, another force was set up, a tendency of the unit to displace itself, or jump from its moorings. If one blade of an airplane propeller is broken disaster follows because the propeller no longer rotates about its center of mass, and the unequal force tends to tear the propeller from its axle. This force is called in this record orbital movement. This orbital or wabbling movement of the mass of the engine must be distinguished from the rocking or oscillating movement about its axis caused by the reaction to the angular thrust of its pistons.

Earlier attacks on the problem were largely along the line of absorbing both the torque and orbital forces by the use of rubber, springs, or other resilient means. Trott's early conception which he demon-

strated to Chrysler and which is not now claimed to be infringed, was to conduct these forces through the front springs to the wheels, and thus keep them away from the body of the car. A few months later he applied for a patent on a method of deadening these forces by mounting the engine on two supports, one of which was pivoted and either, both or neither resilient.

Chrysler suspends the power unit upon two supports so positioned that the unit is in balance, that is, a line between the two supports passes through the center of mass. Chrysler claims, and there is evidence in support, that in an engine so balanced there is no orbital force or wabble to be taken care of, but only the oscillations from torque reactions which are deadened by conventional resilient torque arms. The Chrysler construction is more fully described in patent to Lee, No. 1,902,509, applied for June 6, 1931, issued March 21, 1933. The validity of the Lee patent is not in issue, but the file wrapper discloses its issuance after the Patent Office had considered Trott patent '907. In addition to the two main supports, Trott and Chrysler, and much of the prior art, provide resilient fins or cross members which run from the power unit to the frame to steady or stabilize the motor and to absorb the torque reactions.

The claims in suit were applied for and allowed after Chrysler's floating power was publicized. Nice questions are presented as to whether the applications filed theretofore support the claims thereafter allowed. We find it unnecessary to decide the point, for we conclude that the claims in controversy, if construed broadly enough to warrant a finding of infringement, are invalid for lack of invention in the light of the prior art.

### No. '871 and '907.

Appellants treat claim 33 of '871, and 8 and 11 of '907 as exemplary. They read:

"A method of mounting an engine unit on a vehicle to minimize tremor in the vehicle during operation which comprises supporting an end portion of the engine unit on the vehicle and permitting approximately universal movement at that end portion and holding it against substantial bodily movement, and resiliently supporting the other end portion of the engine unit on the vehicle and permitting orbital movement thereof while the engine unit has torque cushioning oscillation about a longitudinal axis." (Claim 33, '871.)

"The combination with a motor vehicle frame and an engine unit, of two rubber mountings supported on the frame on which the engine unit rests and forming supporting means for the engine unit, one mounting being approximately concentric with the axis of the engine-shaft, and means for stabilizing the rolling motion of the engine unit on the mountings due to the influence incident to the operation of the engine unit." (Claim 8, '907.)

"The combination with a motor vehicle frame and an engine unit, of two spaced mountings supported by the frame and carrying the engine unit, one mounting being nonmetallic and yieldable and having shock cushioning properties and so constructed and arranged as to provide for orbital movement of an end of the engine unit, the other mounting accommodating itself to the requirements of the orbital movement of the first-mentioned mounting, the joint action of the two mountings cushioning the movement due to torque impulses of the engine, and a stabilizing connection between the engine unit and the frame." (Claim 11, '907.)

Claim 33 purports to grant a monopoly upon the method of · mounting an engine unit on two supports, one of which is pivoted to permit universal movement, and the other resiliently supported. Any pivot mounting—ball and socket joint—prevents substantial bodily movement and permits of universal action, and any resilient support permits orbital movement. The method therefore covers all mountings with a universal joint at one end and a cushion of rubber or springs at the other.

Claim 8 covers any combination of two point rubber mountings, one concentric with the engine shaft, together with any stabilizing means. Claim 11· covers a two-point mounting, one being resilient to permit orbital movement, and the other accommodating itself thereto, together with a stabilizing connection between the frame and the unit. In the specifications, Trott did not confine himself to resilient mountings, but stated that in either mounting metal might be substituted for rubber.

Appellants' brief uses this language in describing the invention covered by the claims in suit:

"Trott solved the problem presented in a novel, practical and thoroughgoing manner. He balanced the engine unit on two supports, one at each end, and permitted it to rock on such supports through a con-

siderable degree of angularity and against a resilient stabilizing resistance."

The claims do not mention balancing the engine unit and the specifications, as will be seen, prefer a construction with the engine out of balance. The first issue to be determined, then, is whether, in the light of the prior art, Trott was entitled to patents upon a mounting with a pivotal bearing at one end and a resilient mounting at the other with the necessary supporting fins. Such construction necessarily permits the unit to rock or oscillate within the limits of the resilient front end support.

Royce patent No. 1,108,242 (1914) discloses a method of absorbing motor vibration by the use of springs. The engine weight is carried by fore and aft trunnions fitted into bearings on cross members to the frame; such two point mounting permits limited movement of the unit. Claim 1 covers a mounting which will permit the power unit to rock about its longitudinal axis, which is characteristic of a two point mounting. Claim 5 includes in the combination "spring means operating between said bearings and said engine for limiting the rotary motion of said engine." Patent to Clement, No. 1,000,494 (1911) disclosed a two point mounting for airplane engines to minimize vibration. Two point engine mountings, with resilient means to absorb vibration, were therefore old in the art.

In 1920 one Akimoff applied for a patent, granted by France in 1922. The declared object of the invention was to attenuate vibrations by devices between the motor and the body of an automobile. Akimoff stated that theretofore it had been customary to rely upon springs or pads to deaden vibration, but his idea was to support the motor in such a way as to permit movement in three degrees of freedom, that is, to move about in three ways, while affixed to supports. This he accomplishes by a spherical joint at the rear mounting, manifestly permitting universal movement; the front end is mounted on a cross member supported by horizontal and vertical springs. By this method, the motor oscillates in response to torque reaction about a universal joint at the rear, and any orbital movement is deadened at the front by resilient means. In 1920 Akimoff read a paper, later published in Transactions of American Society of Mechanical Engineers, dealing with vibration, and proposing a mounting for automotive power units consisting of a universal joint at the rear with resilient spring support at the front.

The resilient means of Akimoff are springs instead of rubber; they are placed at the ends of the cross member instead of the center, but the method is clearly the same as claimed by Trott, the absorption of vibration by a universal joint at one end and resilient means at the other.

Masury patent, No. 1,664,040 (1925) discloses the use of rubber as a resilient means for support of a power unit. He uses a plain pivotal bearing at the rear, set in a cross member which is fixed to the frame with rubber supports, and a front mounting which uses rubber for its means of resilience. Masury's patent speaks of the engine unit being carried in "floating suspension." Masury's structure embodies an electric generator with a gasoline power unit, but employs the method disclosed by Trott's method claims.

Patent to Lee, No. 1,788,878 (1927) provides for supporting both ends of the power unit on flexible rubber pads resting on cross members connected with the frame, the rear member being likewise cushioned by rubber blocks.

There are other significant references in the prior art, but these are sufficient to show that so-called two point resilient engine mountings with a universal joint at the rear coupled with means for allowing restrained freedom of movement at the front, designed and used to absorb vibration, whether resulting from torque reaction or orbital movement, were old in the art. Invention is not displayed in Trott's mechanical arrangement employing these ideas. Much is made of the "two point" mounting. Neither appellants, appellees, nor the prior art, disclose an exclusively two point mounting. In each, the cross members which support the power unit rest on four points of the frame; in each, there are supporting fins which steady and at times necessarily carry some weight.

The claims sued on—and we refer only to those—are broad. The method claims are anticipated; in the light of the state of the art, no inventive genius was required to conceive the arrangement of old ideas covered by the combination claims.

We pretermit the question whether claims as broad on their face as these may be narrowed by reference to the drawings and part of the specifications in order to avoid anticipation. The specifications of '871 at the time Chrysler came out dealt almost exclusively with the front axle device not now in suit. The specifications of

'907 were broad, reciting that the mountings might be rubber or metal, or one of rubber and the other of metal, and the supporting fins be designed to carry none, part, or all of the weight. But if the specifications and claims as amended after Chrysler came out are alone considered, and they be construed as far as may be to narrow the claims to avoid anticipation, then there is no infringement. Trott was not entitled to a monopoly on the idea of mounting an engine in a universal joint at the rear and a resilient mounting at the front permitting restrained play. Springs and rubber to deaden vibration were old. The specific arrangement of these old ideas was not used by Chrysler.

In the conventional power unit, the greater part of the weight is well above the crank shaft. Trott put his mountings as nearly concentric with the crank shaft as possible, although in one type of mounting it necessarily was a bit above it. He did suggest some lateral deviation to help offset vibration, but his specifications clearly show that his construction contemplated that the front end of the unit would wabble around the pivot of the universal joint at the rear,—there would be "orbital movement." He undertook to keep the vibration from this wabble away from the frame by his rubber mounting. Chrysler substantially did away with the wabble by putting a bracket under the front mounting of sufficient height so that the weight of the power unit was evenly distributed about the line between the two mountings. He used resilient rubber in his mountings, but there are road shocks to be absorbed as well as torque reactions; and with sidling and hilly roads, there is a displacement of the exact center of mass by the shifting of oil in the crank case, pressure on the clutch, etc. Without intimating an opinion as to the patentability of the Chrysler device, it is constructed on a different principle than Trott's. Both, as did much of the prior art, used conventional so-called two point pivotal and resilient mountings, but these ideas were not patentable. Nowhere in the pages of specifications or claims in suit is there any suggestion of raising the front mounting to a point where the axis would pass through the center of mass. On the contrary, Trott distinctly said he preferred the mountings to be placed under the center of mass.

Appellants rely upon this statement in the specifications of '907 as specifically disclosing the center of mass conception:

"These pivotal mountings may be concentric with the crankshaft 7 of the engine, or vertically or laterally spaced therefrom within reasonable limits, and depending on conditions and requirements.

"That is, if not concentric with the engine shaft, these pivotal mountings may be located in the longitudinal central vertical plane of the power plant unit if the weight thereof will thus be balanced, or laterally off center in either direction if the weight of the power plant unit is not equally distributed on either side of said plane.

"Or, if it is desired to use part of the weight of the power plant unit to oppose the torque reaction or to add to this reaction, these pivotal mountings may be laterally offset an amount in the proper direction to give the result desired.

"However, I prefer mountings at both ends of the power plant unit to be as near as practical to concentric with the engine crankshaft, and that they shall carry substantially the entire weight of the power plant unit. When the pivoted mountings are concentric with the engine crankshaft, the engine unit oscillates in or on the mountings incident to the operation of the engine, and about an axis coincident with the axis of the engine crankshaft."

We read this, as did the trial court, to provide for a vertical departure from the crank shaft when required by the type of mounting used or other conditions of construction; or laterally spaced to oppose torque reaction. The second and third paragraphs of the quotation deal solely with a lateral deviation from the vertical center, and do not teach a vertical deviation from the horizontal center. Trott clearly negatives any intention deliberately to place the front mounting well above the crank shaft for the particular purpose of doing away with orbital movement at the front end in three ways: (1) he states he prefers a concentric mounting; (2) he continually refers to the "orbital movement" at the front end which he takes up by his rubber mountings, and there would be none such of consequence if the motor merely oscillated about the center of mass; (3) neither his drawings nor elaborate specifications disclose any bracket or any conception that placing the front mounting at a mathematically specific point is an integral part of his invention. While we doubt whether the broad claims sued on can fairly be narrowed to the point where they may be sustained at all, yet if so, this one vital dif-

ference in construction avoids the charge of infringement.

## No. 1,897,014.

■ The specifications of '907 describe a torque connection or stabilizer consisting of a brace or braces between the power plant and the frame. Primarily these are designed to resist or take up the reaction from the motor as it rocks back and forth in response to the action and reaction of the piston thrusts. While not specially designed to carry a substantial part of the weight of the power unit—that being carried by the front and rear mountings—the patent recites that such connections may carry a substantial part of the weight of the motor. The claims of '907 included, as a part of the combination, "a stabilizing connection between the engine unit and the frame." Until Chrysler came out using a leaf spring to connect the power unit with the frame, there was no suggestion of such in '907; in '871, in describing the construction not here involved, the front end of the motor rested on a leaf spring through which torque reaction was transmitted to the tires.

This stabilizing connection is the subject of '014, a division of '907. Whether the division is illegitimate, as appellees contend, we need not inquire. The divisional patent, applied for after Chrysler's floating power was on the market, recites that these connections carry substantially none of the weight. Trott claimed various resilient means to prevent the tremors arising from oscillation from passing to the frame. In the various claims allowed, the connecting brace is described as a spring member with yieldable means between the spring and the frame, and as two resilient means having different vibration periods, etc. What he did was to use a leaf or metallic spring as a brace and seated it in rubber where it was attached to the frame. Inventive genius is not employed in the conception of using an ordinary leaf spring seated in rubber to take up vibration. If so, such genius was not disclosed until after the Chrysler cars, so equipped, were on the market. Moreover, Masury patent No. 1,685,430 (1927) used "blocks of yielding non-metallic material adopted to receive the ends of a leaf spring" thus "starting and stopping torques of the motor are yieldingly resisted and the necessary torque action for the motor is provided." This design was for an electric railway truck, although claim 2 covers the construction in combination "with a wheeled vehicle, a motor mounted on the axle." In the light of that disclosure, there can be no vitality to a patent using precisely the same construction for precisely the same purpose on a vehicle propelled by gasoline. The distinction that in Masury the spring carries part of the load is without a difference; Trott's claims are not limited to an unloaded spring and in his disclosure before Chrysler came out Trott specifically embraced a loaded torque arm. The 1925 Maxwell mounted the front end of the motor on a leaf spring to deaden vibration, as did Clement No. 1,000,494, in an airplane engine. Akimoff, in his patent and address before the Engineering Society, supra, disclosed the idea of using springs to dissipate vibration. Lee Patent No. 1,788,878 (1927) disclosed resilient means—rubber—for torque arms which carried substantially no weight. To combine leaf springs, old in the art, with rubber cushions, likewise old, involves no inventive genius. It was too late, in 1931, to secure a monopoly on the conventional use of springs or rubber for the purpose of providing a resilient cushion against shocks.

It is urged, with much vigor, that Chrysler has dealt unfairly with Trott; that Trott was beguiled into disclosing his ideas by an insincere offer to contract, his conception pirated, changed in an immaterial manner, and used without paying the reward to which genius is entitled. The structure Trott demonstrated to Chrysler and others involved the front leaf spring idea which Chrysler did not use and which is not in suit. There is some conflict in the proof as to what Chrysler's counsel learned in fact about the application for '907. There is evidence, supported by memoranda made at the time, that the only thing considered was the front axle idea; and the trial court so found. Whatever the fact may be, the public as well as Chrysler has an interest in all patent monopolies; and if Trott is not entitled to a monopoly against the world on an old idea, the patents should not be sustained in order to punish one concern for its inconsiderate actions. To do so would be to make the entire public atone for the sins of one of its members.

■ Other points are discussed in the elaborate and helpful briefs of counsel. Our work on this difficult case has been materially lightened by the thorough efforts of counsel and the careful consideration of

the trial court. Giving due weight to the trial court's conclusions on the proof, we feel that his decree should not be disturbed. The automotive industry had been struggling with the problem of vibration for years, although its importance decreased as the cylinders increased. Trott made two attacks on the problem—one a departure from the conventional methods, that of passing the vibration to the tires, which is not before us. The other was a workable application of the old idea of letting the motor rock about a universal joint and absorbing the shock by rubber and springs. The broad conception was not patentable; his specific application, even if it involved genius, was not infringed. Trott's negotiations with Chrysler may have caused a renewed attack on the problem; his disclosures may have suggested the mounting which was so shortly put in public use; but no liability follows from that if there is no infringement of the valid claims of a patent.

Affirmed.

PHILLIPS, Circuit Judge (dissenting).

It is my opinion the claims in suit of patent 1,890,871 are not infringed and the claims in suit of patent 1,897,014 are invalid, and I therefore concur in the majority opinion in so far as it affirms the decree below with respect to those claims.

As to the claims in suit of patent 1,834,907, it is my opinion that they are valid and infringed, for reasons I shall undertake to state.

An internal combustion engine consists of a number of cylinders, provided with pistons which are connected by a connecting rod with the engine crankshaft from which the driving power of the engine is derived. In the operation of the engine, the pistons or groups of pistons are successively forced downward by the pressure produced from the explosion of the fuel mixture. It is a law of physics that for every action produced by force there is an equal and opposite reaction. Hence, for each impulse of driving torque applied by the pistons to turn the crankshaft, there is an equal and opposite torque reaction upon the engine causing it to turn in the opposite direction. In other words, when in operation, the engine rocks or oscillates upon or about an axis extending from the front to the rear of the engine.

Prior to Trott's conception, the efforts to overcome the effect of torque reaction had been directed at restraining and cushioning it.

Trott's approach to the problem was new. He conceived the idea of mounting the engine pivotally at the front and rear and permitting it to oscillate on the pivotal mountings with but slight resistance effected by torque arms cushioned in rubber or spring mountings.

The result sought to be attained in the inventions of the prior art is illustrated by a statement in the Royce patent 1,108,242. After describing his invention, Royce says:

"It will be seen by this construction before any movement of the engine can take place the frictional resistance between the disk and the friction face must be overcome, the result of which is that the engine is prevented from getting into a state of oscillation due to the recoil of the springs."

In his specification, Trott states that he accomplished the object of his invention "by providing pivotally resilient mounting means between the engine or power plant unit and its support adapted to carry substantially all of the weight but to transmit substantially none of the torque reaction; and a second means or torque connection between the engine or power plant unit and its support adapted to transmit the torque reaction but to carry substantially none of the weight."

The front and rear pivotal mountings, carrying substantially all of the weight, transmit substantially none of the torque reaction because the engine oscillates therein with substantial freedom.

The other means act as stabilizers to keep the engine from swinging too far and to slightly restrain the oscillatory movement. Because they carry practically no weight, they may be resiliently mounted or cushioned to a greater degree than would be true if they served as a primary support. When thus resiliently mounted, although they slightly restrain the torque reaction, they transmit substantially none of it to the frame.

In the foregoing respects, I find no patent and no publication in the prior art which discloses Trott's conception for preventing torque reaction from being transmitted to the frame on which the engine is mounted.

I conclude his conception is novel, useful, and rises to the dignity of invention.

Trott believed that the axis of oscillation passed through the horizontal center of the crankshaft.[1]

The alleged infringing devices are constructed in accordance with the Lee patent 1,902,509 applied for June 6, 1931, and granted March 21, 1933, and assigned by Lee to his employer, Chrysler Corporation.

Lee discovered the axis of oscillation in such engines was through the center of mass. The center of mass is above the crankshaft. The rear pivotal mounting has to be approximately in line with the crankshaft because of the connection between the power plant and the gears and driving shaft. Hence, it is not practical to provide a true horizontal axis passing through the center of mass by positioning both the pivotal mountings above the crankshaft. Lee therefore mounted the rear pivotal mounting in line with the crankshaft and positioned the front pivotal mounting sufficiently above the crankshaft level to obtain an inclined axis between the two passing through the center of the mass.

When the pivotal mountings are below the axis which passes through the center of mass, the engine in rocking will have a greater side thrust or transverse action than when the mountings are common with an axis passing through the center of mass. While mounting the engine below the center of mass will result in such side thrust, it does not render the device inoperative. This was shown by the practical devices constructed in accordance with patent 1,834,907, and demonstrated to the court at the hearing.

Lee in his patent 1,902,509, adopted Trott's basic conception of dissipating the vibration by permitting it to rock or oscillate on pivotal mountings, with slight, resilient resistance, but having discovered that the axis of oscillation was above the line of the crankshaft, he improved Trott's conception by raising the position of the front pivotal mounting.

It seems to me the question of infringement turns on whether Lee created a new conception or merely improved Trott's main conception.

Robinson On Patents, at section 210, defines improvement as follows:

"An improvement is an addition to or alteration in some existing means, which increases its efficiency without destroying its identity. It includes two necessary ideas: first, the idea of a complete and practically operative art or instrument, either natural or artificial, as the original to be improved; and second, the idea of some change in such art or instrument, not affecting its essential character, but enabling it to produce its appropriate results in a more perfect or a more economical manner. When such a change involves the exercise of the inventive faculties it is a true invention and is known as an improvement."

---

[1] 1. In his specification in patent 1,890,871, he said:

"The result of this re-action is a tendency to revolve the engine about its crankshaft as a center of rotation; * * *

"Each explosion of the engine which tends to make it revolve about its crankshaft. * * *

"The vertical position of the rear power plant mounting, I prefer to be as shown in Figure 1, that is, concentric with the crankshaft, for the reason that the torque of the engine tends to rotate or oscillate the engine about its crankshaft as a center, and such concentric mounting will generally give better results."

In his specification in patent 1,834,907, he said:

"These pivotal mountings may be concentric with the crankshaft 7 of the engine, or vertically or laterally spaced therefrom within reasonable limits, and depending on conditions and requirements.

"That is, if not concentric with the engine shaft, these pivotal mountings may be located in the longitudinal central vertical plane of the power plant unit if the weight thereof will thus be balanced, or laterally off center in either direction if the weight of the power plant unit is not equally distributed on either side of said plane.

"Or, if it is desired to use part of the weight of the power plant unit to oppose the torque reaction or to add to this reaction, these pivotal mountings may be laterally off-set an amount in the proper direction to give the result desired.

"However, I prefer mountings at both ends of the power plant unit to be as near as practical to concentric with the engine crankshaft, and that they shall carry substantially the entire weight of the power plant unit. When the pivoted mountings are concentric with the engine crankshaft, the engine unit oscillates in or on the mountings incident to the operation of the engine, and about an axis coincident with the axis of the engine crankshaft."

For years the automobile industry had sought a means of eliminating the effect of engine vibration imparted to the frame of the motor vehicle. Efforts had been made to do this by cushioning the mountings carrying the engine, by restraining the oscillation, by changing the vibration ratio at the different points of mounting, and other means none of which had proved satisfactory.

Trott ascertained that the result of the torque reaction in a motor vehicle is to cause it to rock or oscillate on a horizontal axis. He conceived the idea of letting it oscillate freely on pivotal mountings, front and rear, in line with the axis of oscillation. He did not discover the true axis of oscillation.

Lee took Trott's basic conception, disclosed by Trott to Chrysler Corporation, elevated the front mounting so as to put the mountings in line with the true axis of oscillation, and by so doing eliminated the side thrust and obtained an improved result. He employed Trott's idea of permitting the engine to oscillate freely on front and rear pivotal mountings carrying the weight of the engine. He did not change the essential character of Trott's conception, but made a change which enabled it to produce its appropriate result in a more perfect way. I conclude that Lee merely effected an improvement; and that defendants' devices infringe patent 1,834,907.

Hence, as to that patent, I think the decree below should be reversed; and respectfully dissent from the majority opinion in so far as it affirms the decree below with respect thereto.