The GENERAL TIRE & RUBBER
COMPANY, Plaintiff,

v.

The FIRESTONE TIRE & RUBBER
COMPANY, Defendant.

The FIRESTONE TIRE & RUBBER
COMPANY, Plaintiff,

v.

The GENERAL TIRE & RUBBER
COMPANY, Defendant.

Civ. Nos. 36799, C 67–206.

United States District Court,
N. D. Ohio, E. D.

June 22, 1970. Withdrawn and Refiled

As Amended July 21, 1972.

See also, D.C., 349 F.Supp. 345.

William C. McCoy, Jr., McCoy, Greene & Howell, Cleveland, Ohio, Charles J. Merriam, Edward M. O'Toole, Carl E. Moore, Jr., Chicago, Ill., Edward B. Beale, Clyde V. Erwin, Beale & Jones, Washington, D. C., Cletus G. Roetzel, Richard E. Guster, Wise, Roetzel, Maxon, Kelly & Andress, Akron, Ohio, for General Tire & Rubber Co.

Jones, Day, Cockley & Reavis, Victor DeMarco, Robert W. Poore, and James E. Courtney, Patrick McCarten, Robert J. Hoerner, Cleveland, Ohio, Stanley M. Clark, David A. Thomas, Akron, Ohio, for Firestone Tire & Rubber Co.

ON MOTION TO DISMISS

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This is a mammoth case involving patent claims which have affected virtually the entire rubber and tire industry of the United States and, indeed, the free world. For all practical purposes, every controversy involving United States companies, together with Dunlop of England, have been settled in this Court over the past several years. Two cases remain which comprise, as will be seen, essentially one controversy and are ripe for trial: (1) General Tire v. Firestone, Civil Action No. 36799, for patent infringement, filed in Cleveland, Ohio, Northern District of Ohio, on April 4, 1961; and (2) Firestone v. General Tire, Civil Action No. 67-206, for declaratory judgment of invalidity and non-infringement of General's patent, filed in Baltimore, District of Maryland, on March 30, 1961, and subsequently transferred to this district under circumstances discussed below.

Each party has filed a motion to dismiss. General has moved to dismiss, alleging fraud on the part of Firestone; and Firestone has moved to dismiss, alleging patent misuse on the part of General. Each party claims its motion to be vital and dispositive of the controversy. Thus, these motions, in the order mentioned above, will be considered and resolved in this Memorandum.

## I. THE FRAUD ISSUE IN CASE NO. C 67-206

General's motion to dismiss the Baltimore case is bottomed on alleged fraud by Firestone, which raises rather delicate problems of judgment. In this circumstance, it was hoped that this motion could be deferred until the end of the trial or disposed of by way of settlement of the case. However, it appears that this is a litigious situation promising to be protracted, difficult, and replete with charges and countercharges of wrongdo-

ing. The parties have been at loggerheads for eight years, and their intransigence shows no signs of softening. After numerous pretrial conferences, it is still difficult to predict the format that the trial will take. In this situation, the Court feels it will be most beneficial to proceed to decide this motion on the completed oral arguments and the submitted briefs and appendices. It is hoped that in ruling on this matter the litigation can be molded into a reasonably coherent posture for trial.

## A. SHOULD FRAUD ISSUE BE RE-EXAMINED?

The threshold question is whether this Court ought to exercise its discretion to re-examine the findings made by the Baltimore court on October 17, 1966. General Tire brought a motion to dismiss this case or transfer the case to Cleveland on the basis of an alleged fraud on the part of Firestone in commencing the suit in Baltimore. In denying the motion to dismiss or transfer, the Baltimore court made specific findings. These findings, along with other factual findings of no wrongdoing on the part of Firestone and its co-plaintiff, McCreary, included:

"Findings of Fact.

. . . . . .

5. No fraud, serious or otherwise, has been practiced upon the Court by the plaintiffs.

6. There has been no effort by plaintiffs to practice fraud upon the Court." (264 F.Supp. 301)

These findings were made by an experienced judge who had conducted the Baltimore trial for more than two years. They were made on a motion similar to the one presently before this Court.

■ Normally "one judge does not consider a point previously decided by another judge of coordinate jurisdiction, and hence such pre-transfer rulings should ordinarily stand." 1A Moore, Section 0.404(8), at 4230. Nevertheless, there is compelling reason to reopen and reconsider the allegations of fraud.

This is not to suggest that the doctrine of "law of the case" is ignored. The Court of Appeals for the Fourth Circuit on January 11, 1967, reversed the order of the Baltimore court denying the motion to transfer or dismiss, and issued a writ of mandamus, in the interest of judicial economy, directing the Baltimore court to dismiss or transfer the case to Cleveland. (373 F.2d 361.) The language of the opinion of the Court of Appeals essentially cancels the findings of the Baltimore Court on the fraud issue and invites a reconsideration of the allegations by this transferee court.

The opinion of the Fourth Circuit has been considered very carefully to determine what that court intended to do with the findings of the Baltimore court. There is language which is most troublesome to interpret. The Court of Appeals said:

"We do not feel it advisable at this stage in the lawsuit to pass on the district court's findings and conclusions with respect to General's contentions of bad faith and misrepresentation to the court. Without denigrating the importance of these issues in the ultimate assessment of costs between the parties, we think that their resolution in favor of Firestone should not have been determinative of the motion to transfer. Indeed we think the Court's preoccupation therewith caused it to overlook completely the factor which should have controlled the decision. That factor was the complete change of conditions which had taken place since the motion was originally denied. This failure resulted in an order which constituted an abuse of discretion." (373 F.2d 361 at 368)

Clearly, the Fourth Circuit's reason for ordering transfer was "the impelling need for efficiency in the administration of our court system. . . ." *Id,* at 368. It said, "We are unanimously of the opinion that the case should be transferred to the Northern District of Ohio in order to prevent an extravagantly wasteful and useless duplication of

time and effort of the federal courts by the simultaneous trial of two complex and elaborate cases involving substantially the same factual issues." *Id*, at 362.

The Fourth Circuit, being expressly concerned with efficient administration, felt it advisable not to pass on the trial court's findings with respect to fraud. This does not mean they accepted these findings. Indeed, they criticized the Baltimore court for its preoccupation with these factors in deciding the motion to transfer or dismiss. The Court of Appeals *could have* passed on these findings, but it declined to do so. This avoidance was obviously intentional.

 Yet the Court of Appeals saw the importance of the bad faith and misrepresentation issues and did not wish to denigrate them. What the Court of Appeals must have intended was not to nullify the findings, and also not to affirm them, but to invite the transferee court to reconsider them. Thus, it is concluded that the Fourth Circuit intended to transfer this case unbound by prior determinations.

Moreover, the intention of the Court of Appeals can be inferred from the fact that it granted an extraordinary writ of mandamus directed against the Baltimore court's order of September 16, 1966, denying the motion. The Baltimore court's findings of October 17, 1966, could only have been made to support its September 16 order. In reversing that order, there was nothing to which the findings of fact on the fraud issue could attach. It would be strange indeed for the Court of Appeals to have ordered transfer of the case with freely-floating findings coming along with it.

 Firestone relies on United States v. First National Bank and Trust Co., 263 F.Supp. 268 (D.C.Ky.1967) to argue that in granting General's motion to transfer on grounds of judicial economy it must be construed that the Court of Appeals denied transfer or dismissal on the basis of fraud. In the *First Na-*

*tional* case, the United States challenged a merger claiming violation of Sections 1 and 2 of the Sherman Act. The district court found for defendant on both counts. The Supreme Court reversed, holding that the merger violated Section 1, but noting that "in view of our conclusion . . . we do not reach the questions posed under § 2." 376 U.S. 665 at 673, 84 S.Ct. 1033 at 1037, 12 L. Ed.2d 1 (1964). Before the divestiture order, Congress enacted a statute which effectively nullified the Supreme Court ruling on Section 1. The United States thereupon attempted to reopen the case in the district court claiming a violation of Section 2. The Court held that since the Supreme Court did not reverse on the Section 2 claims, it was precluded by the "law of the case" doctrine from reconsidering the issue. The *First National* case, while being roughly similar in context, contains factors which lessen its pointed force. The ruling appealed in the *First National* case was a final order denying relief on the merits, whereas here the relief denied in Baltimore was interim in nature and, therefore, not entitled to the same settled respect under the "law of the case" doctrine. 1B Moore's Federal Practice, 0.-404(4). Also *First National* dealt with violations of two separate substantive provisions of the Sherman Act. In the instant case, General's motion was in fact one motion, a motion to "transfer or dismiss." The motion was ruled on as one motion. This is not a mere detail of minor significance. The Fourth Circuit had all factors before it when it reversed the Baltimore court. The Supreme Court in *First National* could have very easily considered the Section 1 controversy without touching the Section 2 questions. Finally, there is a difference in interpretation when an appellate court does "not reach the question" as in *First National*, and when it deems it inadvisable to pass on the findings at the present time, prior to transfer, as in the case here. The former leaves the lower court's determination intact; the latter may, for a wide variety of rea-

sons, lessen the vitality of the lower court's determination. For these reasons, this Court respectfully declines to follow the rule of the *First National* case.

The final factor inducing a decision to reconsider the fraud issue is that certain testimony before the Court of Appeals reveals that the Court, and particularly Judge Haynsworth, was deeply troubled by the fraud issue. Judge Haynsworth asked Firestone's then counsel (not the counsel now acting for Firestone in this court) to explain several statements made in the May 9, 1961, telephone conversation between Mr. Birch and Mr. McCreary, Sr. (General's Appendix, pp. 78–83). It seems clear that Judge Haynsworth was not convinced by the explanation. This testimony was taken December 5, 1966, and thus was not seen by the Baltimore court. Pondering this testimony, it seems most reasonable to conclude that the Fourth Circuit was dubious about the findings made in Baltimore; but since it had determined to transfer the case to Cleveland, it was just as well to leave it for the transferee court to re-examine and resolve the fraud issue.

## B. EXAMINATION OF THE ALLEGATION OF FRAUD.

General alleges fraud in two separate respects. A brief review of the factual background is essential to understanding the nature of the fraud allegations. On December 13, 1960, the same day that General's patent was issued, General filed suits against Goodyear Tire & Rubber Company and United States Rubber Company in Cleveland, charging infringement of General's patent. At about the same time, General sent letters to Firestone, McCreary, and a number of other companies in the industry offering licenses. Firestone contends that it felt threatened with litigation if it did not capitulate. McCreary also maintained that it was under pressure (See Firestone's brief, pp. 8–9). Determining the actual state of mind of these parties, plaintiffs in Baltimore, is un-

necessary. It would seem that, at the very least, these parties were justly concerned with the Cleveland litigation; it was reasonable for them to assume that if they did not reach an accord with General, they would soon be involved in the Cleveland lawsuits. Firestone and McCreary filed a declaratory action in Baltimore on March 30, 1961; on April 4 and 6, General filed an infringement suit against these parties in Cleveland. It is the intentions of Firestone and McCreary in filing this suit which forms the basis of General's first allegation of fraud.

General contends that Firestone began the Baltimore declaratory judgment, not in a good faith effort to adjudicate rights, but as part of a conspiracy with United States Rubber and Goodyear to set off a "backfire" on the Cleveland litigation. General says that the purpose of the declaratory judgment suit was to divide General's legal personnel between Baltimore and Cleveland in an attempt to wear down General and to delay and disrupt the Ohio litigation.

Fragmentary evidence and facts are presented by General to support the allegation that a conspiracy to obstruct the courts was intended. The evidence presented consists of communications between lawyers for Firestone and Goodyear and United States Rubber, communications between Firestone and McCreary. The key fact in the conspiracy allegation is a meeting of counsel for Firestone, Goodyear, and United States Rubber on March 16 and 17, 1961, and notes of Firestone's Baltimore counsel referring to a "backfire."

■■ The evidence offered to show that a conspiracy to obstruct the courts was undertaken is not persuasive. Conspiracy and fraud may be proved by circumstantial evidence, Madsen v. United States, 165 F.2d 507 (10th Cir. 1948), but may not be proved by innuendo and unsupported inferences. General wants this Court to take the fact of meetings and communications and some rather random words, and import all manner of

malicious intentions. Weighing this evidence, the Court can take only reasonable inferences; it cannot be asked to work itself into fancy plottings. Firestone has come forward with considerations which reasonably explain these occurrences. For example, conferences between counsel representing parties with a common interest are an appropriate and usual practice. The Court cannot infer malice and dishonor from a set of facts when those same facts are just as susceptible to an interpretation of innocent and proper behavior. Therefore, it is found that there is insufficient evidence on which to find as a fact a conspiracy on the part of Firestone to join with others to obstruct the Cleveland litigation.

■ General's second contention is that Firestone perpetrated a fraud on the Baltimore District Court in that it misrepresented to the Court the status of its co-plaintiff, McCreary. General alleges that Firestone, fearing that if it began suit alone in Baltimore it was likely that the case would be transferred to Cleveland, sought out McCreary as a co-plaintiff because McCreary was more immune to transfer.

It is important to note what General has not alleged and what is not before the Court. It is not before the Court whether Firestone properly could have consulted with McCreary before filing in Baltimore, or could have encouraged McCreary to file in Baltimore. Neither is it a question whether McCreary could properly have been a co-plaintiff with Firestone in Baltimore as a completely dependent party if this had been accomplished openly. Rather, the issue is whether General has shown by clear and convincing evidence that Firestone misrepresented certain facts concerning McCreary's relationship with Firestone in order to prevent a transfer of the case to Cleveland.

The record unequivocally reveals that counsel for Firestone and McCreary did represent to the Baltimore court that McCreary was an independent party and not a "little patsy" of Firestone's; that he told the Baltimore court at the July 6, 1961, hearing on the first motion to transfer that: "He (McCreary) can, perhaps, derive some benefit from his association with Firestone, but he comes here independently, and not as Firestone's agent or cat's paw, and I think that should be clearly understood." (General's Appendix, pp. 62–4). An affidavit was filed on June 30, 1961, asserting McCreary was "wholly independent of Firestone" (Appendix, p. 57). These are but some of several instances of Firestone's assertions. The record is also clear that Firestone and McCreary did represent to the Court that there was no written or oral agreement between them relating to the participation of McCreary in the conduct of the litigation (General's Appendix, pp. 65, 92, 133).

The Court has been persuaded on the evidence presented by General that these representations were false and therefore constituted a fraud on the Court. The independent status of McCreary is severely undermined by clear and convincing evidence. The fact that McCreary and Firestone shared the same counsel, Firestone's counsel, the statement by McCreary that he would be guided by Firestone's counsel 100%, and that McCreary would be as active as counsel wanted them to be (General's Appendix, pp. 30–31), are indicative of a lack of independent status. Most compelling is the dictaphone belt recording of a conversation between Mr. McCreary and Mr. Birch on May 9, 1961, wherein a billing arrangement was agreed on whereby McCreary would pay one per cent of the cost of the litigation. So, the colloquy between counsel and Judge Haynsworth, wherein counsel tried to explain certain language, such as, "I don't want to put anything in the mail, and I don't want to talk about it too much, for obvious reasons"—clearly leads to the inference that there was an attempt to conceal something of importance in the May 9, 1961, call. It is equally clear from the recording that

Firestone's counsel was taking steps, through a billing arrangement, to obviate the charge that McCreary was a "little patsy." Marshalling all this evidence, the Court is convinced that the one per cent billing arrangement was in fact a sham perpetrated by Firestone on the Baltimore court.

## C. REMEDIES.

█ In its motion to dismiss, General argued that a finding of fraud in the transferred Baltimore case should preclude Firestone from contesting the validity of General's patents, as well as dismissing the declaratory judgment action. This would leave for trial only the infringement issue. After much consideration, the Court declines to adopt this course.

█ █ Counsel for General Tire conceded in oral argument that there exists no authority whereby the fraud of an alleged infringer, in and of itself, caused a patent held by an adverse party to be declared valid, or operated to estop such a wrongdoer from contesting the validity of a patent. Firestone has cited several cases which expressly declined to validate a patent on the grounds of fraud or unclean hands. There is a strong public interest which encourages a hearing of defenses to patents; the monopoly aspects of patents demand that their validity be scrutinized. Heath v. Frankel, 153 F.2d 369 (9th Cir. 1946); Plechaty Co. v. Heckett Engr., Inc., 145 F.Supp. 805 at 806 (N.D.Ohio 1956); Bulldog Elect. Prods. Co. v. Westinghouse Elect. Corp., 162 F.2d 994 (2d Cir. 1947); Trott v. Cullen, 86 F.2d 141 (10th Cir. 1936).

General attempts to meet the authorities by contending that the public interest has in fact been adequately protected in this case. General emphasizes that the whole tire industry, save Firestone, has settled with General and taken licenses. General further points out that Judge Holtzoff already held a hearing with respect to the patent at issue. But the issue before Judge Holtzoff was essentially to determine whether the patent should issue. Therefore, it cannot be construed as a full-blown hearing on the validity of the patent. Likewise, the fact that the rest of the tire industry has elected to take out licenses instead of contesting the validity of General's patent does not remove the public interest in contesting patent monopolies. On the contrary, the public interest must be explored now, or it never will be. In conclusion, the Court declines to hold General's patent valid on the basis of Firestone's fraud.

█ While General's patent may not be rendered valid by virtue of Firestone's fraud, General's further contention that the Baltimore case should be dismissed has considerable merit. The district court has discretion to exercise jurisdiction in a declaratory judgment action. Factors which may be considered are: (1) whether hearing the declaratory judgment action would eliminate uncertainty between the parties, (2) whether the plaintiff's legal rights would be adequately protected if it were not heard, and (3) equitable defenses including the conduct of the parties. 3 Barron and Holtzoff, Federal Practice and Procedure 1266 (1958); Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1966).

█ The Court will consider Firestone's defenses in the Cleveland case. Therefore, any uncertainty will be disposed of therein, and Firestone will be adequately protected because it retains the right to contest the validity of General's patent and to contest infringement. The inequitable conduct of Firestone in misrepresenting the status of McCreary in Baltimore is a clear-cut case of unclean hands. For the foregoing reasons, the Baltimore case is ordered dismissed. See Lumberman's Mutual Casualty Co. v. Quick, 257 F.Supp. 252 (D.C.1966). All defenses, and all litigable issues therein, will be consolidated into the Cleveland case. The parties may enter into the Cleveland case the relevant portions of the Baltimore record. The parties may agree on the

most expeditious means of making the Cleveland record.

The Court deems it to be the wisest course to defer ruling on the matter of costs, attorneys' fees, and punitive damages until such time in the future as it will be appropriate. It goes without saying that the Court considers the fraud which it has found to be extremely serious. The question of costs is, however, a very delicate area. To go into it now would serve only to further exasperate the feelings of the parties. It must be remembered that the Court finds fraud in the misrepresentation of the status of a party; the facts are insufficient to find a conspiracy to obstruct justice.

## II. PATENT MISUSE, CASE NO. 36799

Firestone has moved to dismiss, asserting that General is guilty of patent misuse and, therefore, is not entitled to relief in the courts from patent infringement and its complaint must be dismissed.

Turning to the first alleged misuse, Firestone charges that in its settlement agreements with Goodyear (in paragraph 6[b], Goodrich (in paragraph 5[b], and Uniroyal (in paragraph 5[b]), General authorizes each of its licensees to extend immunity under General's patent. For example, paragraph 6(b) of the Settlement Agreement with Goodyear reads, in pertinent part, as follows:

"General hereby covenants and agrees that it will not assert anywhere any claim . . . against Goodyear, its suppliers, customers and users of its products for infringement . . . of any patent or patent application in the General Tire Patent Rights; and, furthermore, General hereby grants to Goodyear a non-exclusive non-transferable . . . world-wide right and license under the General Tire Patent Rights to make, use and sell products embodying or made by the inventions defined in the General Tire Patent Rights. The provisions of this Article 6(b) shall not apply to third party users . . . of Goodyear-made synthetic rubber-oil blends . . . to the extent, but only to the extent, that they use such Goodyear-made blends in the manufacture of . . . tires, but after four (4) years from the date of this agreement the provisions of this Article 6(b) shall be applicable to such users not licensed under the General Tire Patent Rights other than those against whom a suit by General is pending for infringement of the General Tire Patent Rights, provided Goodyear furnishes appropriate written notice to said third party users . . . advising that immunity is being extended under the General Tire Patent Rights and that a royalty is included in the sales price to said third party users for such immunity."

The purpose and effect of this language is not without ambiguity. Firestone argues that this licensing provision extends the monopoly of General's patent to purchases of unpatented goods. General's licensees will have a competitive advantage, accruing from the leverage of General's immunity, over unlicensed competition (notably Firestone) in selling unpatented Oil Extended Rubber (OER).

General's reply is to point out that the provision does not require Goodyear and the others to grant any immunities, but merely gives them an option. This provision became operative on February 9, 1970. To date, there is no indication that this option has been exercised. While disputing whether granting this immunity would violate the antitrust laws, General insists that even if the Court assumes they are contrary to law, it ought not to assume that the licensees will act contrary to law and exercise the option.

 This response by General in part misses the point and in part traverses the allegation. To establish patent misuse, it is enough to show the exist-

ence of a restrictive agreement which tends to suppress competition in unpatented goods. Morton Salt v. Suppinger, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). So it is not enough to say that the provision remains inoperative. Such an agreement apparently exists; it is an open question whether there is in fact a suppression of competition (see below); and, according to the case law, it is not necessary for a court to find an actual wrongful practice.

On the other hand, however, the types of licensing agreements which the courts have treated as patent misuse are in the nature of tying arrangements which require the purchase of unpatented goods for use with the patented apparatus or goods. Mercoid Corp. v. Mid-Continental Investment Co., 320 U.S. 661, 64 S. Ct. 268, 88 L.Ed. 376 (1944); Morton Salt, *supra*; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942); Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938); Carbice Corp. v. American Patents Develop. Corp., 283 U.S. 27, 57 S. Ct. 334, 75 L.Ed. 819 (1931). This factor of non-requirement does seriously forestall the Court from inferring a tendency to suppress competition. It has been said that where the patentee never, at any time, insisted upon a construction of his license agreements by which a broader monopoly would be acquired, the patentee could not be deemed guilty of misuse. Carter Prods. v. Colgate-Palmolive, 164 F.Supp. 503 (D.C. 1958).

Upon a careful reading of all of the case relied upon by Firestone, the Court was able to discern several critical factors applicable to the doctrine of patent misuse which are not present in the situation in the instant case. In *Mercoid, Leitch, Carbice,* and *B. B. Chemical,* for example, patentees are denied all relief against infringement where the patentee uses his patent monopoly to secure a limited monopoly on unpatented goods. There are two important aspects to this: (1) the patentee is condemned

for using his patent to *control* the manufacture, use or sale of unpatented goods, and (2) the extension of the monopoly is geared to the aspect of benefit inuring to the *patentee.* In this respect, one usually finds that the unpatented goods involved were being sold by the patentee, in conjunction with his patented product. *Cf.* Landis Mach. Co. v. Chaso Tool Co., 141 F.2d 800, 803 (6th Cir. 1944); Lincoln Elect. Co. v. Linde Air Prods., 171 F.2d 223 (6th Cir. 1948).

In this case, General has not limited its licenses by any condition that General's OER be purchased, nor is a more favorable rate offered if purchasers buy such rubber from General or one of its licensees. General does not attempt, with this provision, to use the patent to aid its sales of OER. And General does not control the manufacture, sale or use of unpatented goods.

Firestone argues that the licensing arrangement restrains trade and extends the monopoly of General's patent in that independent, unlicensed competitors cannot offer this grant of immunity. Firestone concedes that if independent licenses were available on the same terms as are the licenses granted with the purchase of unpatented goods, there is no misuse. This is so, because unlicensed competitors of the patentee in the sale of unpatented goods are not disadvantaged. The alleged tying licenses do not restrain trade because all prospective buyers can then purchase at the same royalty.

Firestone cites cases in which disparities in royalty systems are declared to be patent misuse. Barber Asphalt Corp. v. LaFera Grecco Contracting Co., 116 F.2d 211 (3rd Cir. 1940); Dehydrators Ltd. v. Petrolite Corp., 117 F.2d 183 (9th Cir. 1941). In these cases, the competitor is so disadvantaged that he is forced to succumb to the extension of monopoly. General has pointed out that it offered lump-sum licenses to the entire industry on an equal basis. If it is

true that equivalent licensees cannot be achieved because the terms of the settlement agreement provide for lump-sum royalties without apportionment, then General's response does little to rectify this defect. However, more important is the question whether this arrangement restrains competition as contended. In Firestone's cases, such restraint was actually found; and, again, the patentee's product was being forced on the purchaser. In the instant case, no action has been taken by General's licensees which has the effect of placing Firestone at a competitive disadvantage. Mere price advantage which a patent licensee enjoys and which does not involve monopoly of a substantial portion of commerce is not illegal. Martin v. Ford Alexander, 160 F.Supp. 670 (D.C.1958).

The position of Firestone is that the Court's function is to look for anything in the settlement agreements which tends to restrain trade and expand the monopoly, and then find wrongdoing. On the contrary, the Court faces a much more subtle, complex and troubling task. The parties have invoked the equity jurisdiction of the Court, and equitable remedies must be very carefully fashioned. The legions of cases cited by Firestone are clear in that misuse, once found, must be condemned. This task is surely mechanical. The difficult aspect of this problem is to decide whether there has been a patent misuse, and if so, whether it is serious enough to require condemnation. In this regard, the Court is compelled to a further examination of the case law.

Mercoid Corp. v. Mid-Continent Invest. Co., *supra*, does not support Firestone's position. It is clearly distinguishable. In *Mercoid*, the Court found misuse of the patent because the patentee was trying to control competition in the sale of an unpatented part. The crux of that holding is that misuse involves finding a restraint in free competition on items outside the scope of the patent grant.

■ The fact that royalties are paid on unpatented goods is not the test of misuse. Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 833, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) teaches that the test for patent misuse is the purpose and effect of the royalty provision. If the purpose is to enlarge the patent monopoly to cover unpatented goods, as in *Mercoid*, it is to be condemned. Where the agreement does not, and was not intended to, result in extension of patent monopoly, as in *Hazeltine*, it is permissible. In *Hazeltine*, the Court found the purpose of the provision was to establish a reasonable royalty base.

■ In determining when a patentee has committed patent misuse, "it is necessary to consider whether the exercise of the patent monopoly will result in a limited monopoly in an unpatented commodity *as a practical matter*, and whether the patentee *seeks to derive profit, not from the invention itself, but from unpatented supplies used therein.* . . ." Cardox Corp. v. Armstrong Coalbreak Co., 194 F.2d 376 (7th Cir.), cert. den., 343 U.S. 979, 72 S.Ct. 1076, 96 L.Ed. 1336 (1952); Universal Sewer Pipe Corp. v. General Constr. Co., 42 F. Supp. 132 (D.C.Ohio 1942). It is imperative that the Court find an actual realistic effect upon competition. International Salt Co., Inc. v. United States, 332 U.S. 392, 398, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The Court may properly inquire into the alleged misuser's motives behind the arrangement, because "a purpose to expand the scope of monopoly must be found." Stearns v. Tinker & Rasor, 252 F.2d 589 (9th Cir. 1958); Martin v. Ford Alexander, *supra*; Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., *supra*.

■ In general, agreements which limit licenses are not illegal per se, United States v. Birdsboro Steel, 139 F.Supp. 244 (D.C.1956); nor are refusals to grant licenses, United States v. L. P. Caulk Co., 126 F.Supp. 693 (D.C.1955);

nor to select or reject licensees and to prefer one over others in patentee's discretion, United States v. DuPont, D.C., 118 F.Supp. 41, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1954); nor does the mere fact that a patentee combines an unpatented article with his patented article and sells the unit as a whole amount to misuse per se, Stearns v. Tinker & Rasor, *supra*.

■ The fact that a license is given to use a patented product with the purchase of an unpatented product is not of itself patent misuse. Sola Elect. Co. v. General Electric, 146 F.Supp. 625 (D.C. 1956). Title 35, U.S.C. § 271(c) and (d) have been said to change the law of *Mercoid* in this respect. *Id.*, at 647. There must be a showing that the patent monopoly has been expanded or used to restrain trade. Calhoun v. United States, 339 F.2d 665, 168 Ct.Cl. 663 (1964).

■ ■ To invoke the doctrine of patent misuse, the challenger must establish that the patentee used the patent in an attempt to monopolize the sale of unpatented goods or to gain some market or other advantage over other competitors. Automatic Radio Mfg. v. Hazeltine Research, Inc., *supra*; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 143 F.Supp. 429 (D.C.1956). The doctrine of patent misuse is aimed at agreements which use patents to restrain trade or extend the monopoly of the patent. The Court cannot take a surface view of the licensing arrangement and automatically condemn it. There are valid reasons why General may have this provision. Merely to see it in words is not to see it extending monopoly and restraining trade. Firestone charges that this provision is a tying arrangement. But economic coercion and restraint in free competition in unpatented goods are necessary corollaries to tying arrangements. Valmont Industries v. Yuma Mfg. Co., 296 F.Supp. 1291 at 1295 (D.C.1969). There have been no such conditions imposed here.

There is no evidence of coercion, profit motive, or desire to expand monopoly. In *Valmont,* the district court found no requirements, either express or implied, for the purchase of unpatented goods, and found no patent misuse. The same is true here. This Court cannot find any evidence that General was trying to extend its patent monopoly nor tending to suppress free competition in unpatented goods with the challenged licensing provision. Therefore, it cannot be found that the licensing provisions in question constitute patent misuse.

■ The second argument advanced in Firestone's motion to dismiss is that the terms of General's settlement agreements so restrain its independence to enforce its patent as to constitute unlawful restraint of trade and, hence, patent misuse. Firestone points to a number of provisions in these agreements—the "wagering" clause, the "favored nations" clauses, provisions against giving financial aid to General's opponents, etc. —and contends that these constitute an agreement in restraint of trade. The Court will not here examine at length the contentions with regard to construction and interpretation of these clauses; although the provisions are complex, the aim of these provisions is much too clear for argument.

There is a provision that if General fails in its lawsuit against Firestone, General will repay part of the royalty collected from its licensees to Goodyear, Goodrich, and Uniroyal. There is a provision that if General settles with Firestone, these licensees will be given the benefit of any terms in the settlement agreement with Firestone more favorable than those presently accorded the licenses. Firestone argues that by these terms, General has gambled on the outcome of its suit with Firestone; and because of the high stakes, General has voluntarily placed itself in a position where it must litigate "to the bitter end," and, consequently, it has restricted

its independence in dealing with litigation under its patent.

The sinister implications which Firestone would have this Court draw from these provisions are specious and non-existent. The Court sees the "swing" provision as an innocuous attempt to provide for a refund to the licensees should General's patent be held invalid. The provision to accord most favorable terms is nothing more than a strategy to encourage early settlements; it assures early settlers that those following will not benefit from prolonging the struggle. In sum, the provisions in these settlement agreements are legitimate and lawful efforts on the part of the patentee and its licensees to settle their controversies. The Court discerns no conspiracy, no restraint of trade.

Consequently, General is not guilty of any misuse of its patent in these provisions.

## CONCLUSION

Firestone's motion to dismiss is overruled. The Court finds that the questioned provisions in the settlement agreements between General and its licensees fail to form sufficient evidence of patent misuse. Despite Firestone's ingenious arguments, the fair and reasonable interpretations of these settlement provisions admit of no conclusion that General was attempting to extend its monopoly or conspiring to restrict its independence.

The Court has now considered all motions which have prevented the commencement of the trial of this case. It is now ripe for trial. The Court would have liked to find some valid grounds to dismiss in these motions, because the litigation appears to be endless. It appears that such solution is not to be found in motions, but in the reasonable attitude of the parties. This controversy should be settled. In lieu of this happy consequence, the trial shall commence on September 28, 1970.

It is so ordered.